| | |
|---|---|
| Eudaldo Báez Galib y otros<br>    Peticionarios<br><br>      v.<br><br>Comisión Estatal de Elecciones y otros<br>    Demandados | MANDAMUS<br><br>2000 TSPR 161 |
| Damaris Mangual y otros<br>    Peticionarios-Demandados<br><br>      v.<br><br>Comisión Estatal de Elecciones y otros<br>    Demandados | |

Número del Caso: MD-2000-8
                 MD-2000-9
Fecha: 2/noviembre/2000

**MD-2000-8**
Peticionario Por Derecho Propio:

            Lcdo. Eudaldo Báez Galib


Abogados de la Parte Demandada:

            Hon. Gustavo A. Gelpí
            Procurador General

Comisión Estatal de Elecciones:

            Lcdo. Pedro A. Delgado Hernández

Comisionado Electoral PPD

            Lcdo. Carlos J. López Feliciano

**MD-2000-9**
Abogados de los Peticionarios:

            Lcdo. Carlos Iván Gorrín Peralta
            Lcdo. Denis Márquez Lebrón
            Lcdo. José E. Torres Valentín

Abogados de la Parte Demandada:

            Hon. Gustavo A. Gelpí
            Procurador General

Comisión Estatal de Elecciones:

            Lcdo. Pedro A. Delgado Hernández

Comisionado Electoral PPD:

            Lcdo. Carlos J. López Feliciano

    Este documento constituye un documento oficial del
    Tribunal Supremo que está sujeto a los cambios y
    correciones del proceso de compilación y publicación
    oficial de las decisiones del Tribunal. Su distribución
    electrónica se hace como un servicio público a la
    comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eudaldo Báez Galib y otros          '
     Peticionarios                  '      MD-2000-8
                                     '
          v.                         '
                                     '
Comisión Estatal de                  '
Elecciones y otros                   '              Mandamus
     Demandados                      '
     ------------------------------------
                                     '
Damaris Mangual Vélez y otros        '
     Peticionarios                   '      MD-2000-9
                                     '
          v.                         '
                                     '
Comisión Estatal de                  '
Elecciones y otros                   '
     Demandados                      '
                                     '
     ------------------------------------


Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton


San Juan, Puerto Rico, a 2 de noviembre de 2000.

Mediante el vehículo procesal de mandamus se nos solicita, en jurisdicción original, que ordenemos al Presidente de la Comisión Estatal de Elecciones [en adelante C.E.E.], Juan R. Melecio, y a sus miembros, a que, de cara a las elecciones generales del 7 de noviembre del 2000, acaten el mandato de la Constitución del Estado Libre Asociado de Puerto Rico, en sus disposiciones pertinentes, y no pongan en ejecución lo dispuesto en la Ley Núm. 403 del 10 de septiembre de 2000, conocida como "Ley de Elecciones Presidenciales en Puerto Rico". Dicho estatuto impone a la

C.E.E., la responsabilidad de organizar, administrar y realizar una elección en la jurisdicción del Estado Libre Asociado de Puerto Rico para elegir compromisarios para que éstos eventualmente voten por el Presidente y Vicepresidente de Estados Unidos.

Luego de evaluar los alegatos de las partes concernidas y las disposiciones constitucionales aplicables, resolvemos expedir el auto de mandamus solicitado por los peticionarios y declarar inconstitucional la Ley de Elecciones Presidenciales en Puerto Rico.

I

El 10 de septiembre de 2000 el Gobernador de Puerto Rico, Hon. Pedro Rosselló González, firmó la Ley Núm. 403, denominada como "Ley de Elecciones Presidenciales en Puerto Rico", [en adelante Ley Núm. 403]. Esta ley impuso a la C.E.E., la responsabilidad de organizar, administrar y realizar en la jurisdicción del Estado Libre Asociado de Puerto Rico, una elección para elegir compromisarios para que éstos eventualmente voten por el Presidente y Vicepresidente de Estados Unidos. Conforme al texto de la Ley Núm. 403, esta elección presidencial sería realizada de forma simultánea con las elecciones generales del 7 de noviembre próximo.

Con ese fin, la Ley Núm. 403 autorizó "el uso de los recursos, equipo, propiedad mueble e inmueble, así como de los empleados y funcionarios adscritos a la Comisión, que sean necesarios para llevar a cabo todos los procesos y actividades relacionadas con dicha elección". Art. 1.3 de la Ley Núm. 403. Asimismo, ordenó al Presidente de la C.E.E. que desarrollara y ejecutara "una campaña de información y orientación al elector sobre la celebración de las elecciones presidenciales en Puerto Rico", para lo cual debía utilizar "todos los medios de comunicación y técnicas de difusión pública a su alcance, incluyendo la divulgación a través de los medios televisivos y la Internet". Art. 3.5 de la Ley Núm. 403. Finalmente, la Ley Núm. 403 asignó a la C.E.E. "la cantidad de novecientos mil ($900,000) dólares, de fondos no comprometidos del Tesoro Estatal para los gastos relacionados con la organización e implantación de los procesos de la elección presidencial". Art. 4.3 de la Ley Núm. 403.

Conforme a su Exposición de Motivos, la Ley Núm. 403 fue aprobada como consecuencia de la decisión emitida por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (Hon. Jaime Pieras, Juez), en el caso Gregorio Igartúa de la Rosa v. U.S., Civil Núm. 00-1421 (JP), en el cual se resolvió que los puertorriqueños, por razón de su ciudadanía estadounidense, tenían derecho a votar en Puerto Rico en las elecciones presidenciales, y ordenó al gobierno del Estado Libre Asociado de Puerto Rico a que implantara los mecanismos necesarios para viabilizar el ejercicio de dicho voto.[1]

Luego de la aprobación de la Ley Núm. 403, el Partido Independentista Puertorriqueño, [en adelante P.I.P.], a través de su Presidente, el Licenciado Rubén Berríos Martínez, y la agrupación PROELA, acudieron por separado al Tribunal de Primera Instancia en

---

[1] En una decisión de carácter interlocutorio, dicho foro federal resolvió que los puertorriqueños residentes en Puerto Rico tenían derecho a votar en las elecciones presidenciales. Gregorio Igartúa de la Rosa v. U.S., 107 F. Supp. 2d 140 (D. Puerto Rico 2000) (sentencia declaratoria de 19 de julio de 2000). Eventualmente, en la sentencia del caso, el Tribunal de Distrito Federal reafirmó sus pronunciamientos y ordenó expresamente al Gobierno de Puerto Rico a que organizara y realizara una elección presidencial. Gregorio Igartúa de la Rosa v. U.S., Civ. No. 00-1421, ___ F. Supp. 2d ___ (D. Puerto Rico 2000) 2000 WL 1300356 (sentencia final e injunction de 29 de agosto de 2000).

donde presentaron una solicitud de injunction y sentencia declaratoria para que se invalidara la legislación.[2]

El Senador Eudaldo Báez Galib del Partido Popular Democrático, por su parte, presentó un recurso de "mandamus" ante esta Curia en el cual alegó que la Legislatura de Puerto Rico no posee autoridad alguna para ordenar la realización de una elección presidencial. Añadió que cualquier asignación de fondos públicos para dicho evento viola la Sección 9 del Artículo VI de la Constitución del Estado Libre Asociado que impone al Estado la obligación de usar fondos del erario para fines públicos. Sostuvo que procedía expedir un mandamus dirigido a la C.E.E. y a sus funcionarios para que respetaran dicho mandato constitucional y organizaran las elecciones generales sin incluir el proceso del voto presidencial.[3]

A petición del Gobierno de Puerto Rico, el Tribunal de Distrito Federal aceptó la remoción de todos estos casos de los tribunales de Puerto Rico y los consolidó para su eventual adjudicación.[4]

Mientras estos casos estaban pendientes en el Tribunal de Distrito Federal, el Tribunal de Circuito de los Estados Unidos para el Primer Circuito, revocó la decisión emitida en Igartúa de la Rosa v. U.S., supra, que motivó la aprobación de la Ley Núm. 403.[5] Indicó el Tribunal de Circuito al respecto:

> In Igartúa I, a case brought by the same lead plaintiff and lawyer who appears currently before us, this court held with undeniable clarity that the Constitution of the United States does not confer upon United States citizens residing in Puerto Rico a right to participate in the national election for President and Vice-President. Addressing precisely the argument presented to the district court in this case, this court recognized that Article II of the Constitution explicitly provides that the President of the United States shall be elected by electors who are chosen by the States, in such manner as each state's legislature may direct. **We concluded that Puerto Rico, which is not a State, may not designate electors to the electoral college, and therefore that the residents of Puerto Rico have no constitutional right to participate in the national election of the President and Vice-President**. Igartúa de la Rosa v. U.S, 2000 WL 1521203 C.A. 1 (Puerto Rico), 2000 (Énfasis suplido, citas omitidas).

El Tribunal de Circuito Federal rechazó de plano desviarse de sus claros precedentes sobre este asunto y reiteró enfáticamente la inexistencia de un derecho constitucional al voto presidencial como derivado de la ciudadanía estadounidense. Añadió que sólo un cambio en la condición política de Puerto Rico mediante su incorporación como estado federado, o una enmienda a la Constitución de los Estados Unidos permitiría que los puertorriqueños pudieran votar en Puerto Rico por el Presidente y Vicepresidente de Estados Unidos. Señaló, además:

> Since our decision in Igartúa I in 1994, Puerto Rico has not become a State, nor has the United States amended the Constitution to allow United States citizens residing in Puerto Rico to vote for President, as it did for United States citizens residing in the District of Columbia with

---

[2] Véanse, Rubén Berríos Martínez v. E.L.A., Civil Núm. KPE00-2275; y Luis Vega Ramos v. Gobierno de Puerto Rico, Civil Núm. KPE00-2289.

[3] Eudaldo Báez Galib v. C.E.E., MD-2000-8.

[4] Véanse, 28 U.S.C. secs. 1441, 1446 y 2083.

[5] Igartúa de la Rosa v. U.S., 2000 WL 1521203 C.A. 1 (Puerto Rico), 2000.

the Twenty-Third Amendment to the Constitution. <u>Igartúa de la Rosa</u> v. <u>U.S.</u>, 2000 WL 1521203 C.A. 1 (Puerto Rico), 2000. (Citas omitidas).

Así las cosas, Damaris Mangual Vélez, como Comisionada Electoral del P.I.P., y Pedro Martínez Agosto, Irma Rodríguez Agosto, Maribel Arroyo Rodríguez, Rosalina Vega Rivera, y Carlos Aner Navarro Carrasquillo, en su calidad de funcionarios de la C.E.E., acudieron ante este Tribunal mediante recurso de mandamus. Nos solicitaron que expidiéramos un auto de mandamus dirigido a la C.E.E., su Presidente y sus miembros,[6] "para que procedan de inmediato con todas las gestiones necesarias para la celebración de las elecciones generales del 7 de noviembre de 2000 sin poner en vigor lo dispuesto en la Ley de Elecciones Presidenciales", la que, aducen, es inconstitucional. Petición de Mandamus, en la pág. 23.

Los peticionarios nos expresan que la Ley Núm. 403 les impone "obligaciones legales [...] a pesar de que se oponen por razones ideológicas a la celebración de dicha elección presidencial en Puerto Rico" y que tales obligaciones están afectando sus funciones en la C.E.E. Nos indican, además, que: (1) la Ley Núm. 403 constituye un ejercicio inconstitucional de autoridad legislativa en violación del Art. II, sección 19 de la Constitución del Estado Libre Asociado, ya que pretende "implantar ficticiamente un derecho legal inexistente y perseguir el objetivo de alterar la relación de poder entre Puerto Rico y Estados Unidos, sin que el pueblo lo haya autorizado"; (2) la Ley Núm. 403, al perseguir objetivos constitucionalmente ilegítimos, al asignar fondos públicos y autorizar el uso de recursos públicos viola la Sección 9 del el Art. VI de nuestra Constitución, preceptiva de que sólo podrán ser usados fondos públicos para fines públicos legítimos; y (3) que la Ley Núm. 403 persigue adelantar la causa de la estadidad por lo que violenta el principio de igualdad económica electoral inmerso en la Sección 9 del Art. VI de la Constitución de Puerto Rico.

En vista de la proximidad del evento electoral y de la importancia pública que reviste este asunto, concedimos término a las partes para que se expresaran sobre los siguientes aspectos: (1) la procedencia del mandamus como vehículo procesal para solicitar nuestra intervención; (2) la jurisdicción de los tribunales de Puerto Rico a la luz del caso <u>Gregorio Igartúa de la Rosa, et al</u>. v. <u>U.S</u>., Núm.00-2083, que estaba pendiente ante el Tribunal de Distrito Federal; y (3) sobre cualquier otro asunto que las partes desearan plantear.

Por su parte, el Senador Eudaldo Báez Galib, acudió el 24 de octubre de este año ante esta Curia solicitándonos que expidamos el mandamus que previamente había presentado.[7] Acompañó con su moción una copia de la orden del Tribunal de Distrito Federal mediante la cual se devolvía el caso a los tribunales de Puerto Rico.[8]

El 26 de octubre de este año, consolidamos los dos recursos ante nuestra consideración y, en auxilio de nuestra jurisdicción y como medida provisional, ordenamos a la C.E.E. demás funcionarios, empleados y agentes de dicha Comisión "abstenerse de seguir organizando, [implantando] y viabilizando los procesos para la elección presidencial dispuesta en [...] la Ley Núm. 403 [...]". Además, concedimos un término breve a todas las partes para que expusieran sus posiciones sobre los méritos de los recursos presentados.

Hoy, luego de evaluar las comparecencias de todas las partes, así como el derecho aplicable, resolvemos sin ulterior trámite, a tenor con la Regla 50 del Reglamento de este Tribunal.

II

La Constitución de Puerto Rico en su Artículo V, Sección 5, establece que "[e]l Tribunal Supremo, cada una de sus salas, así como cualquiera de sus jueces,

---

[6] En su recurso fueron demandados además de la C.E.E. y su Presidente, Juan R. Melecio, los comisionados electorales del Partido Nuevo Progresista, Pedro Figueroa Costa, y del Partido Popular Democrático, Carlos López Feliciano.

[7] Véase, supra, nota al calce núm. 3.

[8] Orden de 20 de Octubre de 2000.

podrán conocer en primera instancia de recursos de habeas corpus y de aquellos otros recursos y causas que se determinen por ley". La Ley de la Judicatura de Puerto Rico amplió la jurisdicción original de este Foro para considerar en primera instancia recursos de **mandamus**, quo warranto y auto inhibitorio. Plan de Reorganización de la Rama Judicial Núm. 1, Art. 3.002. Además, los artículos 649 y 650 del Código de Enjuiciamiento Civil contemplan que este Tribunal pueda expedir autos de mandamus en jurisdicción original. Véanse, 32 LPRA secs. 3421-22; Regla 16 del Reglamento del Tribunal Supremo de Puerto Rico.

Como se sabe, el recurso de mandamus es un auto discrecional y altamente privilegiado mediante el cual se ordena a una persona o personas naturales, en este caso a un funcionario público, el cumplimiento de un acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes. 32 L.P.R.A. sec. 3421. Este recurso "está concebido para obligar a cualquier persona, corporación junta o tribunal inferior a cumplir un acto que la ley particularmente le ordena como un deber resultante de un empleo, cargo o función pública, cuando ese deber no admite discreción en su ejercicio, sino que es ministerial". David Rivé, "El Mandamus en Puerto Rico", 46 Rev. C. Abo. P.R. 15, 19 (1985).

Hemos destacado en el pasado que, como condición para expedir un auto de mandamus, debemos considerar los siguientes factores: "el posible impacto que éste pueda tener sobre lo intereses públicos que puedan estar [involucrados]; [...] evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros". Noriega v. Hernández Colón, 135 D.P.R. 406, 448 (1994). No hay duda que de entre éstos, al momento de decidir expedir el auto, cobra particular importancia el posible impacto que pudiera tener su expedición sobre los intereses públicos. De ordinario, el posible impacto público que tendrá la expedición del mandamus será proporcional a la importancia del deber ministerial que se alega ha sido incumplido y que se pretende vindicar mediante el mandamus.

Como funcionario público sujeto a lo dispuesto en nuestra Constitución y las leyes, el Presidente de la C.E.E. y sus funcionarios están sujetos al auto de mandamus. Ahora bien, ¿cuál es el deber ministerial que origina la expedición del auto de mandamus en el presente caso? Dicho de otro modo, ¿qué deber ministerial queda

incumplido por el Presidente de la C.E.E. y los funcionarios de dicha Comisión si dan cabal cumplimiento a lo dispuesto en la Ley Núm. 403?

Indudablemente, el Presidente de la C.E.E., como funcionario gubernamental, tiene el deber ministerial de actuar conforme a derecho. La expedición del auto de mandamus, por tanto, queda plenamente justificada como mecanismo para obligar a la C.E.E., a su Presidente y a sus funcionarios, a la obediencia ministerial de leyes válidas o de disposiciones constitucionales, cuyo cumplimiento, se sabe, es ineludible.

De igual forma, el recurso de mandamus permite exigir que un funcionario no acate o cumpla con una ley o actuación gubernamental cuando su cumplimiento quebranta un deber ministerial de superior jerarquía, como lo sería un deber ministerial impuesto por la Constitución del Estado Libre Asociado. Véanse, Bailey v. McDougall, 66 Misc.2d 161, 320 N.Y.2d 271 (1970) ("relief in the nature of mandamus may be granted to compel a public body or officer to refrain from taking particular administrative action in contravention of a clear mandate of law", en la pág. 163); In the Matter of New York Post Corporation, 2 N.Y.2d 677 (1957) ("relief in the nature of mandamus may be granted to compel a public body or officer to refrain from taking particular administrative action in contravention of a clear mandate of law, even though the immediate relief sought is of a preventive rather than an affirmative nature", en la pág. 684); Forrest G. Ferris, The Law of Extraordinary Legal Remedies 227 (1926). De existir un deber legal que contravenga una obligación constitucional, el primero ha de ceder ante la Ley Suprema. Vargas v. Chardon, 405 F.Supp. 1348 (1975).

La exigencia de un deber ministerial definido no impide ni exime a los tribunales de la obligación de interpretar la Constitución y las leyes. La procedencia del auto de mandamus no está proscrita por el hecho de que se requiera una interpretación judicial del deber ministerial invocado. Rosati v. Haran, 459 F.Supp. 1148 (1977) ("[M]andamus will not be precluded solely because judicial construction is required to clarify the duty. Thus, mandamus will lie

not only where a federal officer has failed to comply with a specific statutory or regulatory directive, but also where a constitutionally mandated duty has not been performed", en la pág. 1151); véanse además, Mattern v. Weinberger, 519 F.2d 150, 156-57 (1975); Feiss v. Milwaukee County, 525 N.W.2d 768, 775 (1994); State v. Thomson, 37 A.2d 689, 692 (1944).

En el presente caso, somos de opinión que, como veremos más adelante, el cumplimiento de la Ley Núm. 403 infringe un deber ministerial de mayor jerarquía: el impuesto por la Sección 9 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico, que requiere a todo funcionario público la obligación de utilizar fondos públicos para fines públicos. Por lo tanto, la C.E.E. y sus funcionarios tienen el deber ministerial de abstenerse de utilizar recursos públicos para un propósito que se aparte de la finalidad pública exigida por la Constitución. El recurso de mandamus constituye, por lo tanto, el mecanismo adecuado para ordenar a la C.E.E. que cumpla con su deber ministerial de viabilizar procesos electorales constitucionalmente válidos.

Finalmente, a escasos días del proceso electoral autorizado por la Ley Núm. 403, la obtención de un remedio rápido y eficaz no está disponible mediante los mecanismos judiciales ordinarios ni mediante los extraordinarios que pudieran ser presentados ante el Tribunal de Primera Instancia o ante el Tribunal de Circuito de Apelaciones. El problema planteado requiere una solución pronta y definitiva a través de nuestra intervención directa en un asunto que es esencialmente de naturaleza constitucional. No podemos pasar por alto que los asuntos relacionados a materia electoral gozan en nuestro ordenamiento jurídico de un sitial de la más alta importancia.

En lo que respecta a la atención que debemos brindarle los tribunales, especialmente ante la proximidad del evento electoral, ésta debe ser rápida, de forma tal que se le imprima certeza y finalidad al asunto. Esta certeza y finalidad solamente se la puede dar el Tribunal Supremo de Puerto Rico. En el caso de autos no hay otro recurso o remedio disponible para los peticionarios en un asunto de vital importancia para nuestro sistema democrático de gobierno. Esta responsabilidad no la podemos abdicar. En estas circunstancias, el auto de mandamus es el único remedio judicial existente para prevenir una elección que es ilegal. People v. Boyle, 98 Misc. 364, 163 N.Y.S. 72 (1917). En vista de todo lo anterior, resolvemos que el recurso de mandamus, presentado en jurisdicción original ante este Foro, constituye el vehículo procesal adecuado para resolver la presente

controversia. Véanse, Báez Galib v. Rosselló González, res. 22 de enero de 1999, 99 T.S.P.R. 3, 147 D.P.R. ___ (1999); Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982); Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960). José A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 925-932 (2000).

III

El Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, supra, dispone lo siguiente:

> Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.

En P.I.P. v. C.E.E., 120 D.P.R. 580, 606 (1988), destacamos que el texto de esta disposición "no es nada enigmático". Añadimos que "la noción de finalidad pública juega un papel importante en nuestro ordenamiento jurídico" pues "[a] diferencia de los particulares quienes, siempre que sea lícito, pueden actuar para los fines más variados, la búsqueda de un fin de interés público es la condición positiva de toda actuación estatal". Id.

En esa ocasión, además, modificando nuestros pronunciamientos en P.S.P. v. E.L.A., 107 D.P.R. 590 (1978), resolvimos que la determinación inicial de los poderes políticos en torno a lo que constituye un fin público merece deferencia. Al respecto afirmamos que al ejercer nuestras prerrogativas constitucionales de juzgar la validez jurídica de las actuaciones de las otras ramas de gobierno con relación al uso de fondos del erario para fines considerados como públicos "los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos". P.I.P. v. C.E.E., 120 D.P.R. en la pág. 611. Ello significa que el ejercicio de nuestra facultad interpretativa de la sección 9 del Art. VI "no [es] distinto al desempeño normal de la función revisora que nos corresponde

ejercer bajo el sistema de separación de poderes". P.P.D. v. Rosselló González, res. 22 de diciembre de 1995, 139 D.P.R. ___ (1995).

Ahora bien, esa deferencia no significa que los tribunales debemos renunciar a ejercer nuestra facultad constitucional de evaluar si determinado uso de propiedad o fondos del Estado por parte de la Legislatura y el Ejecutivo constituye un uso para un fin público. Esa deferencia tampoco puede ser llevada al absurdo de que este Tribunal se cruce de brazos para permitir un uso de fondos públicos para un fin claramente contrario a nuestro ordenamiento constitucional, pues "la Constitución [...] se impone a la legislación ordinaria". P.I.P. v. C.E.E., 120 D.P.R. en la pág. 612 (énfasis suplido).

En el presente caso, la parte peticionaria sostiene que la Ley Núm. 403 infringe la Sección 9 del Art. VI y el axioma constitucional de igualdad económica electoral en la medida en que coloca a Puerto Rico en una situación similar a la de un estado dentro del sistema constitucional de Estados Unidos. En su comparecencia ante este Tribunal, Damaris Mangual y otros afirman al respecto lo siguiente:

> La [implantación] efectiva de la Ley 403 sin duda persigue adelantar la causa de la estadidad, defendida sólo por uno de los tres partidos políticos principales. Los fondos asignados para la implantación de la ley, por lo tanto, favorecen la causa ideológica de uno sólo de los partidos. Ello es particularmente significativo en vista de que la Ley ordena a la C.E.E no sólo que celebre la elección, sino que invierta cientos de miles de dólares en una campaña de información y orientación, no meramente para informar al electorado de la oportunidad de votar, sino para instar a los electores que en efecto participen masivamente en la elección presidencial. Petición de Mandamus, en la pág. 14.

El Procurador General, por su parte, intentando demostrar la existencia de un fin público que fundamenta la aprobación de la Ley Núm. 403 nos señala:

> ¿No es, en el peor de los casos, un fin público legítimo el mero hecho de poder manifestar al Presidente electo y su partido nacional, al igual que al candidato y partido perdedor, que el Pueblo de Puerto Rico lo respalda o no lo respalda? Como ciudadanos americanos que somos, tal mensaje nos daría más voz a nivel nacional que la que actualmente gozamos. Esto debido a que durante el cuatrienio que comienza (2001-2004) tanto el nuevo Presidente, al igual que su oposición política a nivel federal, conocerán por primera vez en la historia de la Nación Americana el parecer del Pueblo de Puerto Rico sobre qué candidato y qué plataforma federal prefiere. [...]. **Aunque esto no constituye un voto** *de jure* **por el [P]residente, es igual de importante y efectivo, pues es un ejercicio del poder de expresión de nuestro Pueblo sobre la ejecutoria del Presidente, el cual se habrá de escuchar a través de toda la nación americana.** Informe del Procurador General, en la pág. 16 (énfasis suplido).

Nuestro examen de la legislación impugnada, así como de las comparecencias de las partes nos convence de que la Ley Núm. 403 no constituye un ejercicio legislativo válido al amparo de la Sec. 9 del Art. VI. La asignación de fondos públicos para la elección presidencial ordenada por la Ley Núm. 403 carece de un fin público discernible. El Procurador General sólo nos expresa que la referida ley promueve que los puertorriqueños se expresen sobre la ejecutoria del Presidente de Estados Unidos. Independientemente del hecho de que tal aseveración es incorrecta, pues el actual Presidente de Estados Unidos no figurará como candidato a Presidente, lo cierto es que esa expresión que realizarían los puertorriqueños carece de consecuencia práctica legítima alguna.

La Constitución de los Estados Unidos sólo permite a los ciudadanos domiciliados en un estado de la Unión o del Distrito de Columbia votar por el Presidente de los Estados Unidos. Así lo han reconocido en forma clara y expresa los Tribunales de Apelaciones de los Estados Unidos en Igartúa de la Rosa v. U.S., 32 F.3d. 8 (1994) y en Igartúa de la Rosa v. U.S., ___ F.3d ___ (1er Cir. 2000), 2000 WL 1521203. Por otro lado, ni la Constitución del Estado Libre Asociado, ni la Ley de Relaciones Federales con Puerto Rico, 1 L.P.R.A. secs. 1 et seq., permiten la realización de un evento electoral en Puerto Rico para que las personas elijan a unos compromisarios, para que éstos, a su vez, voten por el Presidente y Vicepresidente de los Estados Unidos. Precisamente, esto es lo que la Ley Núm. 403 dispone. Se trata, por lo tanto, de una legislación que pretende que el pueblo puertorriqueño efectivamente seleccione a unas personas para que realicen una función que la propia ley establece. Si esa votación no tiene consecuencia alguna a la luz de lo resuelto por el Tribunal de Circuito Federal en el caso de Igartúa de la Rosa, supra, no existe fin público alguno que se satisfaga conforme al texto constitucional.

La Ley Núm. 403 contrasta con el estatuto que validamos en P.I.P. v. C.E.E., supra. Allí los procedimientos de primarias

presidenciales conducían a la selección de delegados que asisten, participan y votan en las convenciones de partidos nacionales. Su comparecencia y participación en dichas asambleas está reconocida como plenamente válida en los reglamentos de dichas organizaciones políticas. Por tanto, la participación de los delegados puertorriqueños tiene una consecuencia tangible y concreta en la confección y aprobación de los programas de gobierno de dichos partidos nacionales y en la selección de las personas que han de implantarlo. Estos dos eventos innegablemente tienen un gran impacto sobre los puertorriqueños, por lo que, en P.I.P. v. C.E.E., supra, entendimos que constituía un fin público asegurarse de que las primarias allí atendidas estuvieran debidamente reguladas por el ordenamiento electoral nuestro.

Sin embargo, la elección presidencial que propone la Ley Núm. 403 no tiene consecuencia práctica alguna. Su validez no está reconocida por la Constitución de los Estados Unidos, que es la única autoridad que podría conceder ese derecho.

Por otro lado, el Procurador General sostiene que, en caso de no reconocerse la validez del voto presidencial, quedaría como fin público residual el interés de los puertorriqueños en expresar su deseo de participar en dicho sufragio. Este argumento es, cuanto menos, frívolo. La Ley Núm. 403 no se concibió como una consulta sobre la deseabilidad del voto presidencial, sino que presume la validez de dicho voto y dispone la elección entre los candidatos al ejecutivo federal. La transmutación de ese proceso en una mera expresión pública sobre la participación puertorriqueña en los comicios federales, como alega el Procurador General, se aparta impermisiblemente de la clara intención legislativa al aprobar la medida. En todo caso, sostener esta bifurcación entre la letra de la ley y el efecto hipotético del voto presidencial, según expuesto por el Procurador General, implicaría promover una falacia electoral de descomunal proporción y perpetuaría una ficción que tiene como eje central una votación no permitida por la Constitución de los

Estados Unidos, según concluido por los tribunales federales. Igartúa de la Rosa v. U.S., supra. En ausencia de un fin público discernible y definido, es evidente que su propósito es únicamente político partidista, según veremos a continuación, lo cual es ajeno a lo dispuesto en nuestra Constitución sobre el uso de fondos públicos.

De otro modo, estimamos que esta legislación violenta el axioma constitucional de igualdad electoral de los partidos políticos inscritos, en la medida en que promueve una práctica electoral que es cónsona con una fórmula de status que sólo propugna un partido político, en este caso, el Partido Nuevo Progresista. En este sentido, el evento estructurado legislativamente mediante la Ley Núm. 403 inclina la balanza a favor de la alternativa de status defendida por dicha entidad política. La asignación de fondos y recursos públicos con el fin de poner en ejecución la Ley Núm. 403 constituye, por lo tanto, una asignación impermisible que socava el esquema democrático de neutralidad gubernamental en los asuntos de status. Como hemos afirmado en el pasado, la Constitución del Estado Libre Asociado de Puerto Rico no favorece ninguna alternativa de status. Tampoco cierra puertas a alternativa alguna. P.S.P. v. E.L.A., 107 D.P.R. 590, 606 (1978). Su texto es neutral en cuanto al destino político del país. Cualquier medida legislativa o gubernamental que tenga el efecto de inclinar la balanza a favor de alguna alternativa de status sin que tenga la aprobación de los puertorriqueños, infringe el esquema de neutralidad que al respecto se deriva de nuestra Constitución. La Legislatura, si bien puede formular política pública sobre distintas áreas del quehacer gubernamental legítimo, no puede aprobar legislación que altere sustancialmente la relación política de Puerto Rico con Estados Unidos sin que previamente haya obtenido la aprobación de los puertorriqueños a ese curso de acción. Id. Así lo reafirmamos recientemente en Ramírez de Ferrer v. Mari Bras, res. el 18 de noviembre de 1997, 144 D.P.R. ___, cuando destacamos que "[e]l **pueblo** de Puerto Rico conserva la facultad de procurar cambios de status." (Énfasis suplido).

IV

En vista de lo anterior, es evidente que la Ley Núm. 403 es inconstitucional por violentar la Constitución de Puerto Rico en su Sección 9 del Artículo VI. Constituye una asignación indebida de fondos públicos para un propósito sin consecuencia legítima alguna.

Por lo tanto, se expide el auto de mandamus y se ordena a la Comisión Estatal de Elecciones, a su Presidente, Juan R. Melecio, y a sus funcionarios a que celebren las elecciones generales del 7 de noviembre de este año sin incluir procedimiento alguno relacionado con la elección presidencial dispuesta en la Ley Núm. 403. También ordenamos la paralización inmediata y permanente de todos los procedimientos encaminados a organizar, implantar y viabilizar la votación presidencial allí dispuesta. Se imparte carácter permanente a las medidas provisionales que establecimos en la Resolución del 26 de octubre de 2000. La C.E.E. mantendrá vigentes las prohibiciones allí establecidas. Además, tomará todas las medidas necesarias para poner en vigor lo aquí resuelto de forma tal que todo material relacionado a la votación presidencial autorizada por la Ley Núm. 403 —incluyendo, pero sin limitarse a, cualquier urna, papeleta o insignia identificativa de algún candidato o partido participante en dicho proceso— sea retenido por funcionarios de la Comisión sin que esté expuesto a los votantes y sin que se afecte el proceso regular de votación en las elecciones generales del 7 de noviembre de 2000. Durante el procedimiento de escrutinio de aquellas papeletas de procedimientos especiales, —incluido, pero

no limitado, al voto ausente, voto de confinados y voto de funcionarios del orden público– se descartarán las papeletas recibidas relativas al voto presidencial. La C.E.E. no contabilizará las mismas ni informará sobre resultado alguno que de ellas se infiera.

Se emitirá la Sentencia correspondiente. Considerando la proximidad de las elecciones y el impacto de esta decisión sobre dicho proceso, este dictamen tendrá vigencia inmediata y cualquier moción de reconsideración que se presente no tendrá efecto interruptor sobre lo aquí dispuesto, a menos que este Tribunal disponga lo contrario.


Federico Hernández Denton
Juez Asociado

Eudaldo Báez Galib y otros '
    Peticionarios                 '     MD-2000-8
                                '
        v.                  '
                                '
Comisión Estatal '
de Elecciones y otros '            Mandamus
    Demandados             '
---------------------------------
                                '
Damaris Mangual Vélez, y otros '
    Peticionarios                 '     MD-2000-9
                                '
        v.                  '
                                '
Comisión Estatal de '
Elecciones y otros '
    Demandados             '
                                '
---------------------------------


SENTENCIA

San Juan, Puerto Rico, a 2 de noviembre de 2000.

    Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integral de la presente Sentencia, se expide el auto de mandamus y se declara inconstitucional la Ley Núm. 403 de 10 de septiembre de 2000.

    Se ordena a la Comisión Estatal de Elecciones, a su Presidente, Juan R. Melecio, y a sus funcionarios a que celebren las elecciones generales del 7 de noviembre de este año sin incluir procedimiento alguno relacionado con la elección presidencial dispuesta en la Ley Núm. 403 de 10 de septiembre de 2000. También ordenamos la paralización inmediata y permanente de todos los procedimientos encaminados a organizar, implantar y viabilizar la votación presidencial allí dispuesta.

    Se imparte carácter permanente a las medidas provisionales que establecimos en la Resolución del 26 de octubre de 2000. La C.E.E. mantendrá vigentes las prohibiciones allí establecidas. Además, tomará todas las medidas necesarias para poner en vigor lo aquí resuelto de forma tal que todo material relacionado a la votación presidencial autorizada por la Ley Núm. 403 –incluyendo, pero sin limitarse a, cualquier urna, papeleta o insignia de algún candidato o partido participante en dicho proceso– sea retenido por funcionarios de la Comisión sin que esté expuesto a los votantes y sin que se afecte el proceso regular de votación en las elecciones generales del 7 de noviembre de 2000. Durante el procedimiento de escrutinio de aquellas papeletas de procedimientos especiales, –incluido, pero no limitado, al voto ausente, voto de confinados y voto de funcionarios del orden público– se descartarán las papeletas recibidas relativas al voto presidencial. La C.E.E. no contabilizará las mismas ni informará sobre resultado alguno que de ellas se infiera.

    Considerando la proximidad de las elecciones y el impacto de esta decisión sobre dicho proceso, esta Sentencia tendrá efecto inmediato y cualquier moción de reconsideración que se presente no tendrá efecto interruptor sobre lo aquí dispuesto, a menos que este Tribunal disponga lo contrario.

    Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señor Rebollo López y señor Fuster Berlingeri emitieron Opiniones de Conformidad. Los Jueces Asociados señor Corrada del Río y señor Rivera Pérez emitieron Opiniones Disidentes.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

Eudaldo Báez Galib y otros

    Peticionarios

        v.

                     MD—2000—8       MANDAMUS

Comisión Estatal de Elecciones;
y otros

    Demandados
————————————————————————
Damaris Mangual Vélez, y otros

    Peticionarios

        v.                    MD—2000—9       MANDAMUS

Comisión Estatal de Elecciones
y otros

    Demandados


    Opinión de Conformidad emitida por el Juez Asociado SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 2 de noviembre de 2000

    El tiempo, en su pausado pero implacable transcurrir, ha mostrado ser el más certero de los jueces. Con el pasar del tiempo, las disidencias --en ocasiones-- se consolidan en prudentes convergencias. El presente caso es un ejemplo vivo de ello; dos de las posiciones disidentes, que desde hace algunos años venimos objetivamente sosteniendo, acertadamente se convierten hoy en mayoritarias.

I

    El 12 de septiembre de 2000, el peticionario, Eudaldo Báez Galib, presentó ante este Foro, en jurisdicción

original, un recurso de mandamus solicitando se le ordene a la Comisión Estatal de Elecciones (Comisión) no incluir en las elecciones generales, a celebrarse el próximo 7 de noviembre del año en curso, el proceso dirigido a votar por el presidente de los Estados Unidos. De otro lado, el 19 de octubre de 2000, Damaris B. Mangual Vélez, Pedro Martínez Agosto, Irma Rodríguez Morales, Maribel Arroyo Rodríguez, Rosalina Vega Rivera y Carlos Aner Navarro Carraquillo, acudieron ante nos, igualmente mediante recurso de mandamus, formulando similar petición.

Luego de varios trámites, el pasado 26 de octubre emitimos Resolución consolidando ambas acciones y resolviendo ejercer nuestra jurisdicción original. Le concedimos a las partes un término para que presentaran sus respectivos alegatos en torno a la constitucionalidad de la Ley Núm. 403 de 10 de septiembre de 2000. Además, ordenamos "a la Comisión Estatal de Elecciones, su Presidente y Comisionados, demás funcionarios, empleados y agentes de dicha Comisión, abstenerse de seguir organizando, implementando y viabilizando los procesos para la elección presidencial dispuesta por la citada ley Número 403."

No obstante estar conforme con la Opinión mayoritaria y con la Sentencia emitidas, hemos considerado conveniente expresarnos por separado.

II

El Tribunal Supremo, cada una de sus Salas, así como cualquiera de sus Jueces, podrán conocer en primera instancia de recursos de hábeas corpus y de aquellos otros recursos y causas que se determinen por ley. Véase: Artículo V, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico. En aras de instrumentar dicho mandato constitucional, en la Ley de la Judicatura, 4 L.P.R.A. Sec. 22i (a), se extendió la jurisdicción original de este Tribunal a recursos de "mandamus, [...] quo waranto, [y] auto inhibitorio [...]."

El mandamus es un recurso altamente privilegiado dirigido a "una persona o personas naturales, a una corporación o a un tribunal judicial de inferior categoría, [...] requiriéndoles para el cumplimiento de algún acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes". 32 L.P.R.A. sec. 3422.

El mencionado recurso está concebido para obligar a las personas antes señaladas a cumplir con un acto que una legislación le impone, como resultado de un empleo, cargo o función pública cuyo cumplimiento no admite discreción, sino que es ministerial. Véase: D. Rivé Rivera, Recursos Extraordinarios, 2da ed., Univ. Interamericana de P.R., San Juan, 1996, pág. 107. En esencia, un deber ministerial, según definido jurisprudencialmente, es aquél impuesto por una ley válida que no permite discreción en su ejercicio, sino que es mandatorio e imperativo. Noriega v. Hernández Colón, 135 D.P.R. 406, 448 n.52 (1994).

Para que proceda el recurso no se requiere que el deber ministerial surja de forma clara y expresa de las disposiciones legales aplicables, pues tal requisito reduciría nuestra función de interpretar la Constitución y las leyes. Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982). Dicho deber ministerial puede proceder de una legislación o de la Constitución, como ley suprema.[9] Además, como toda obligación, el deber ministerial de un funcionario público puede consistir en hacer o no hacer alguna cosa.[10] Por consiguiente, no debe haber duda alguna sobre el hecho de que el recurso de mandamus puede ser utilizado con el fin de ordenarle a un funcionario público que se abstenga de hacer alguna cosa, cuya ejecución resultaría contraria a una ley o a la Constitución.

Así, cualquier intento de poner en vigor una ley que contraviene la Constitución de Puerto Rico constituye una violación del mandato constitucional de actuar legalmente y conforme a derecho, deber impuesto por esta misma Constitución. En caso de que la ley impugnada atente contra los mandatos constitucionales, este Tribunal tiene el deber y obligación de declarar judicialmente inconstitucional dicha ley y ordenar a todo funcionario público abstenerse de poner en vigor la misma.

Repetimos aquí lo que expresáramos en nuestra Opinión disidente, hace casi diez años, en Gierbolini v. Hernández Colón, 129 D.P.R. 402 (1991):

> "[…]no existe ninguna objeción lógica al principio de un "mandamus" negativo. Menos aún en este caso. Lo contrario sería definir el remedio superficialmente. En estas situaciones lo que se manifiesta como negativo en su forma, es innegablemente, positivo sustantivamente.
>
> El propósito esencial del auto de mandamus es obligar a la obediencia ministerial de una ley válida, a través del cumplimiento de deberes específicos. El principal deber ministerial de la Comisión Estatal de Elecciones, y de su presidente el Sr. Juan R. Melecio, es el de actuar

---

[9] La Constitución de Puerto Rico obliga a todos los funcionarios públicos; la misma opera de forma mandatoria e imperativa, sin dar margen a discreción alguna. En este sentido, en Hernández Agosto v. Romero Barceló, ante, reconocimos que el auto de mandamus puede ser utilizado para compeler al cumplimiento de los deberes impuestos por la Constitución. De hecho, el Artículo VI, Sección 16 de la Constitución, exige que "[t]odos los funcionarios y empleados del Estado Libre Asociado, sus agencias, instrumentalidades y subdivisiones políticas prest[en], antes de asumir las funciones de su cargo, juramento de fidelidad a la Constitución de los Estados Unidos de América y a la Constitución y a las leyes del Estado Libre Asociado de Puerto Rico".

[10] A estos efectos, el Art. 1041 del Código Civil de Puerto Rico, 31 L.P.R.A. 2991 dispone que "[t]oda obligación consiste en dar, hacer o no hacer alguna cosa", conforme surja de la ley y demás fuentes de las obligaciones. Véase, además, 31 L.P.R.A. Sec. 2992.

conforme a derecho. <u>Cualquier intento de poner en vigor una ley que claramente contraviene la Constitución de Puerto Rico y la de los Estados Unidos, constituye una violación del mandato constitucional de actuar legalmente y conforme a derecho, deber impuesto por estas mismas Constituciones</u>. El recurso de mandamus obliga a actuar afirmativamente sólo cuando se incumple con los deberes que ordena una ley válida. Por el contrario, puede exigir el que no se acate una actuación o ley inconstitucional, porque si no se estaría promoviendo el quebrantamiento de un deber constitucional." (Enfasis suplido.)

Debe señalarse en cuanto a este aspecto, finalmente, que los factores a considerar, al momento de decidir si se expide o no un recurso de mandamus, son los siguientes: "el posible impacto que éste pueda tener sobre los intereses públicos que puedan estar envueltos, el evitar una intromisión indebida en los procedimientos del ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros." <u>Noriega</u> v. <u>Hernández Colón</u>, ante. De todos ellos, el de mayor importancia es el del posible impacto al interés público. *Id.*

En el caso de autos, por tanto, resulta mandatorio evaluar, primeramente, si la medida legislativa es o no constitucional. De no ser válida conforme a nuestro ordenamiento constitucional, vendremos en la obligación de expedir el recurso de mandamus con el fin de vindicar los mandatos constitucionales.


III

La Sección 9, Artículo VI, de la Constitución del Estado Libre Asociado de Puerto Rico expone que "[s]ólo se dispondrá de las propiedades y fondos públicos <u>para fines públicos</u> y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". (Énfasis nuestro.) <u>El requisito de "finalidad pública" es un presupuesto indispensable en todo proceso de erogación de fondos públicos que limita la capacidad de actuar del Estado</u>. En cuanto al alcance de este concepto, en <u>P.P.D.</u> v. <u>Gobernador</u>, res. el 22 de diciembre de 1995, 139 D.P.R. ___ (1995), este Tribunal expresó que:

"El concepto de *'fin público'* no es uno estático y sí uno ligado al bienestar general que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja. Su significado ha cobrado un marco dimensional de naturaleza liberal, <u>generalmente prevaleciendo el criterio de que los objetivos que estuvieren contemplados en el referido fin público deben redundar en beneficio de la salud, seguridad, moral y bienestar general de todos los ciudadanos</u>." (Énfasis en el original. Cita omitida.)

La Asamblea Legislativa, no hay duda, posee una amplia discreción a los efectos de determinar lo que constituye un fin público. De ordinario, no habremos de invalidar dicha determinación a menos que sea manifiestamente arbitraria e incorrecta. <u>Asoc. Pro Control de Acceso Calle Maracaibo, Inc.</u> v. <u>Cardona Rodríguez</u>, res. el 31 de octubre de 1997, 144 D.P.R. ___ (1997). No obstante,

tal deferencia <u>no</u> nos priva de nuestra facultad de interpretar finalmente la Constitución, la cual es ineludible e indelegable. <u>P.S.P.</u> v. <u>E.L.A.</u>, 107 D.P.R. 590, 599 (1978).

En <u>P.I.P.</u> v. <u>C.E.E.</u>, 120 D.P.R. 580 (1988), en atención al tema que nos ocupa, este Tribunal señaló que:

> "El gobierno en el Estado moderno tiene que ser un ente activo y creador. La naturaleza cambiante de la función legislativa justifica que este cuerpo cuente con los instrumentos necesarios para encarar exitosamente los retos de la vida moderna. Por ser las Asambleas Legislativas de los Estados democráticos los cuerpos donde maduran y toman forma las fuerzas sociales latentes u operantes, y donde sólo es posible definir con la necesaria precisión la mayor parte de los elementos que componen y constituyen el llamado fin o interés público, las opciones del legislador en este campo son amplias, <u>siempre y cuando éste se mueva dentro del marco de la Constitución.</u>"

A tenor con estos principios, procedemos a evaluar el estatuto bajo nuestra consideración.


IV

El 10 de septiembre de 2000, se aprobó y entró en vigor la Ley Núm. 403, conocida como "Ley de Elecciones Presidenciales en Puerto Rico" (Ley 403). De conformidad con el artículo 1.3 de esta Ley, la Comisión Estatal de Elecciones "tendrá la responsabilidad de organizar, implantar y viabilizar los procesos para la elección presidencial en la jurisdicción del Estado Libre Asociado de Puerto Rico". Dicho artículo, también autoriza el uso "de los recursos, equipo, propiedad mueble e inmueble, así como de los empleados y funcionarios adscritos a la Comisión, que sean necesarios para llevar a cabo todos los procesos y actividades relacionadas con dicha elección". Para ello, se asignó la cantidad de $900,000.00. Artículo 4.3, Ley 403.

En esencia, el propósito de esta legislación consiste en "<u>viabilizar el derecho de los ciudadanos americanos residentes en Puerto Rico a votar en las elecciones presidenciales</u>", poniendo así "en ejecución el reconocimiento de la igualdad [--entre los ciudadanos americanos domiciliados en un Estado y aquéllos domiciliados en Puerto Rico--] en el ejercicio al voto presidencial, <u>que es inherente a la ciudadanía americana</u> que ostentan los puertorriqueños". (Énfasis nuestro.) Exposición de Motivos, Págs. 1 y 5.

En aras de sostener la validez y eficacia del derecho al voto presidencial de los ciudadanos americanos domiciliados en Puerto Rico, el legislador puertorriqueño hace varias afirmaciones a través de la exposición de motivos de dicha Ley, a saber:

> "En la sentencia emitida el 29 de agosto de 2000 por el honorable Jaime Pieras, Jr. [...] se le ordena al Gobierno de Puerto Rico que actúe de la forma más expedita posible para crear los mecanismos mediante los cuales los ciudadanos de los Estados Unidos domiciliados en Puerto Rico puedan votar en las próximas elecciones a través de la elección de compromisarios presidenciales.

[...]

El Congreso, además, ha reconocido que el derecho al voto en las elecciones presidenciales dimana de la ciudadanía nacional y no depende de cuestiones de federalismo, ni requiere una enmienda constitucional para que se implemente en Puerto Rico. [...]

Además, las Enmiendas XXIV y XXVI apoyan el criterio de que el derecho a participar en las elecciones presidenciales no se da en función de residencia de un estado sino como un derecho individual de la ciudadanía. [...]

El Tribunal Supremo Federal también ha reconocido que la territorialidad no es determinante del derecho de un ciudadano a votar en unas elecciones que le afecten. [...]

El hecho de que Puerto Rico está sujeto a la cláusula territorial de la Constitución tampoco afecta el derecho fundamental al voto que tienen sus residentes. [...] Al negarle el derecho al voto a los ciudadanos americanos residentes en Puerto Rico el gobierno federal, particularmente el Congreso, actuaría fuera de su ámbito de autoridad y denegaría un derecho dimanante de la ciudadanía nacional.

[...] El término `estado´ en el Artículo II no significa que los ciudadanos de Estados Unidos residentes en los territorios no puedan votar en las elecciones presidenciales sino que es producto de un tiempo en el cual los estados eran las únicas subdivisiones políticas con capacidad para llevar a cabo elecciones nacionales. Este término ha evolucionado en su significado y el Congreso lo ha extendido a Puerto Rico en diversa legislación, por lo que no existe razón por la cual el término `estado´, utilizado en el Artículo II, no se haga extensivo a Puerto Rico. [...]"

Así mismo, y con el propósito de imprimirle legitimación al proceder legislativo de aprobar la Ley Núm. 403, el Procurador General de Puerto Rico alega que dicho proceso pretende instrumentar un fin público legítimo. <u>Sin embargo, es evidente que tal fin público no existe, pues el acto legislativo impugnado descansó en todo momento en una premisa equivocada</u>: la existencia del <u>derecho eficaz</u> al voto presidencial por los ciudadanos americanos domiciliados en Puerto Rico. En otras palabras, y por los fundamentos que expondremos a continuación, <u>dicho derecho es uno jurídicamente inexistente</u>.

Los peticionarios militantes del P.I.P. acertadamente señalan, en su petición de mandamus, que desde el 1994 la Corte de los Estados Unidos para el Distrito de Puerto Rico y la Corte de Apelaciones de los Estados Unidos para el Primer Circuito habían decidido en un caso previo, <u>Igartúa de la Rosa</u> v. <u>United States</u>, 842 F. Supp. 607 (D.P.R. 1994), *confirmada* 32 F. 3d 8 (1er Cir. 1994), *certiorari denegado*, 514 U.S. 1049 (1995), que los ciudadanos de Estados Unidos que residen en Puerto Rico no tienen derecho a votar por el presidente y el vicepresidente de dicho país; <u>decisión que reiteró y ratificó la Corte de Apelaciones de los Estados Unidos para el Primer Circuito</u>

al revocar una reciente decisión emitida por el Tribunal de Distrito Federal para el Distrito de Puerto Rico. Véase: Igartúa de la Rosa v. United States, No. 00-2083, slip op. (1er Cir. Oct. 13, 2000).

Tal es el estado jurisprudencial federal actual del asunto que nos ocupa. Por otro lado, en P.S.P. v. E.L.A., ante, este Tribunal hizo claro que las ramas legislativa y ejecutiva del Estado Libre Asociado de Puerto Rico no pueden disponer legislativamente del asunto del voto presidencial sin antes hacer una consulta al pueblo de Puerto Rico y que el resultado de la misma sea favorable a dicha legislación.

Estamos convencidos de la corrección de lo dicho por este Tribunal en P.S.P. v. E.L.A., ante, lo cual reafirmamos --hace doce años-- en el voto disidente que emitiéramos en P.I.P. v. C.E.E, ante, a los efectos de que los forjadores de la Constitución del Estado Libre Asociado tuvieron el propósito de diseñar un esquema que dejase libre a todo ciudadano para propulsar y defender sus propias ideas sobre el destino final de nuestro pueblo. No puede invocarse la Constitución de Puerto Rico como apoyo para paso alguno que incline o aparente inclinar la balanza, a juicio de otros sectores de opinión, hacia determinado tipo de status.

En el citado caso de P.S.P. v. E.L.A., ante, este Tribunal abordó la solución al caso que hoy nos ocupa. Dejamos claro, entonces, que:

> "[l]o ocurrido con el voto presidencial también ilustra el reconocimiento de esta reserva de poder a favor del pueblo de Puerto Rico. El Grupo Asesor Ad Hoc sobre el Voto Presidencial para Puerto Rico recomendó el 18 de agosto de 1971 "que se conceda el derecho a votar por el Presidente y el Vice-presidente de los Estados Unidos a todos los ciudadanos de los Estados Unidos residentes en Puerto Rico que reúnen las cualificaciones normalmente requeridas...." Se recomendó al mismo tiempo, sin embargo, "que se celebre un referéndum para determinar si la mayoría del electorado en Puerto Rico desea votar por los dos funcionarios federales que nos representan a todos, no solamente a una parte de la ciudadanía." Presidential Vote for Puerto Rico, Report of the Ad Hoc Advisory Group on the Presidential Vote for Puerto Rico, August, 1971, pág. 33. No tuvo éxito el intento posterior de obtener que la Asamblea Legislativa autorizase la celebración de este plebiscito.
>
> Es al pueblo de Puerto Rico, por tanto, a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos. La Asamblea Legislativa del país tiene facultad para disponer plebiscitos no discriminatorios sobre tales medidas o sobre la cuestión general del status. La asignación de fondos para tales fines

constituye indudablemente una asignación de fondos para fines públicos."

En el presente caso, la Rama Legislativa, al aprobar la ley aquí impugnada, hizo caso omiso e ignoró el estado de derecho prevaleciente tanto en nuestra jurisdicción, como en la jurisdicción federal, en la cual existía una determinación, con fuerza de cosa juzgada, denegatoria del derecho de los ciudadanos americanos domiciliados en Puerto Rico a votar por el presidente y vicepresidente de los Estados Unidos.

Debe resaltarse el hecho de que, en la exposición de motivos para la aprobación de dicha Ley, la Asamblea Legislativa expresa como único interés perseguido por esta medida reconocer e instrumentar un derecho al voto presidencial, bajo las constituciones de Estados Unidos y de Puerto Rico, el cual, repetimos, evidentemente no existe. Es forzoso concluir que la Ley que nos ocupa no está respaldada por un interés público legítimo, lo cual opera contra la legalidad de la erogación de fondos para su implementación.

Es indiscutible el hecho de que la finalidad de la Ley 403 es la de que Puerto Rico sea asimilado a la estructura federal como si fuera un estado. Tal como alegan los peticionarios, es obvio que el propósito de la legislación es el de alterar, a corto o a largo plazo, la relación de poder entre Puerto Rico y Estados Unidos, y lograr un poder ahora inexistente. Esto, evidentemente, sería un paso real o simbólico hacia la consecución de la estadidad o la unión permanente de Puerto Rico con los Estados Unidos. En consecuencia, la implementación efectiva de la Ley 403 persigue adelantar causas partidarias ajenas a las de los peticionarios. Con la erogación de fondos que la ley asigna para la ejecución del mandato legislativo, se afectaría ilegítimamente la causa ideológica de los peticionarios que favorecen la independencia, en la medida en que se infringe el principio de igualdad electoral contenido en la Sec. 6 del Art. IX de nuestra Constitución. Véase P.R.P. v. E.L.A., 115 D.P.R. 631, 637 (1984).

Esta legislación, por lo tanto, definitivamente infringe el esquema conceptual de neutralidad alrededor del cual se diseñó la Constitución del Estado Libre Asociado de Puerto Rico, constituyendo dicha pieza legislativa un intento solapado de la Asamblea Legislativa de modificar sustancialmente el status o destino político de Puerto Rico, facultad específicamente reservada al pueblo.

Tradicionalmente se ha aceptado que una acción del Gobierno del Estado Libre Asociado de Puerto Rico para promover que los puertorriqueños puedan votar directamente por el Presidente de

23

Estados Unidos requiere, de nuestra parte, el consentimiento previo del Pueblo de Puerto Rico en votación especial (referéndum) a esos efectos por constituir el mismo una modificación sustancial a la condición política del Estado Libre Asociado.

Ese, quizás, sería el caso si mediante la citada Ley 403 los puertorriqueños pudieran expresarse sobre si desean, o no, votar por el presidente y vicepresidente de los Estados Unidos. Todo lo contrario; la Ley 403 constituye un ilegal intento de la Asamblea Legislativa de Puerto Rico para permitir que los puertorriqueños emitan un voto el cual es uno ineficaz, en relación con las referidas elecciones presidenciales, derecho que, como hemos visto, no está autorizado ni por la Constitución de los Estados Unidos ni por la Constitución del Estado Libre Asociado de Puerto Rico.

En consecuencia, la legislación que hoy nos ocupa exclusivamente tiene el efecto y propósito de adelantar o promover los intereses políticos de los partidos que en Puerto Rico propulsan la estadidad y la unión permanente con Estados Unidos en detrimento sustancial de los intereses del partido que, por el contrario, promueve el ideal de independencia como destino político final de nuestro país.

La fuerza motriz que impulsa dicho proceso electoral la constituye el crudo interés de un sector político de mayoría de lograr acceso a los centros de poder en Washington, D.C., con el propósito de obtener concesiones que favorezcan su gestión, y fortalezcan su posición política en Puerto Rico, lo que tiene el efecto de discriminar contra el sector ideológico que propulsa la independencia para nuestro país.

En ello, a la luz de nuestra realidad constitucional, radica una violación a las cláusulas constitucionales de Igual Protección de las Leyes [11] e Igualdad Electoral. La Ley de Elecciones

---

[11] Según el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico:
    "[...]Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona

Presidenciales en Puerto Rico —no obstante aparentar ser neutral y no establecer clasificaciones de su faz— **vulnera tales cláusulas constitucionales por razón de que el propósito obvio de la Asamblea Legislativa al promulgarla, y su efecto, es el de alterar el proceso político puertorriqueño, inclinando la balanza a favor de determinados sectores ideológicos en detrimento de otros**.

Como certeramente expresara este Tribunal en <u>Marrero</u> v. <u>Mun. de Morovis</u>, 115 D.P.R. 643, 645-647 (1984), en "'la medida en que los fondos públicos se utilicen para propaganda político partidista se está afectando detrimentalmente el derecho de los demás electores'". **La finalidad pública que en el presente caso este Tribunal viene en la obligación de proteger debe ser, y es, la de evitar que el Estado utilice los fondos públicos del pueblo para inclinar nuestro destino político hacia determinado rumbo**. La Ley de Elecciones Presidenciales en Puerto Rico en ese sentido <u>atenta</u> contra nuestra Constitución. En la medida que esto sucede, la misma <u>no</u> puede tener fin público legítimo alguno.

La exposición de motivos de dicha Ley, en la cual la Asamblea Legislativa pretende amparar la legalidad de la misma, constituye, a nuestro humilde entender, un simple subterfugio que intenta encubrir una crasa violación a nuestra Constitución.

V

En consecuencia, es correcta la decisión de este Tribunal de expedir el auto de mandamus y ordenar a la Comisión Estatal de Elecciones, su Presidente y sus funcionarios a paralizar inmediata y permanentemente todos los procedimientos relacionados con la elección presidencial dispuesta en la Ley 403 ante su inconstitucionalidad por no estar avalada por un fin público legítimo, según requerido por la Sec. 9 del Art. VI de nuestra Constitución, y por coartar, además, las cláusulas constitucionales de Igual Protección de las Leyes y la Cláusula de Igualdad Electoral contenidas en la misma.

Por las razones antes expresadas, e independientemente de nuestras preferencias personales, en el descargo responsable de nuestras funciones

alguna en Puerto Rico la igual protección de las leyes. [...]"

judiciales nos vemos en la obligación de brindarle nuestra <u>conformidad</u> a la Opinión mayoritaria emitida por el Tribunal en el presente caso; celebrando, de paso, que la mayoría del Tribunal finalmente haya acogido y adoptado las posiciones disidentes que, respecto a esta materia, hemos venido sosteniendo hace largo tiempo. Errar, ciertamente, es de humanos; aceptar que se ha errado, como lo hace la Mayoría en el presente caso, es indicio de humildad y sabiduría.


**FRANCISCO REBOLLO LÓPEZ**
**Juez Asociado**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Eudaldo Báez Galib y Otros | * | MANDAMUS |
| Peticionarios | * | |
| vs. | * | MD-2000-8 |
| Comisión Estatal de Elecciones y Otros | * | |
| Demandados | * | |

Damaris Mangual Vélez, y Otros

Peticionarios

vs.                                        MD-2000-9

Comisión Estatal de Elecciones
y Otros

Demandados

Opinión de Conformidad emitida por el Juez Asociado señor FUSTER BERLINGERI.


San Juan, Puerto Rico, a 2 de noviembre de 2000.


I

**La procedencia del mandamus**

Estoy conforme con lo expresado en la opinión del Tribunal en cuanto a la procedencia del mandamus en el caso de autos. En vista de las circunstancias extremas que presenta este caso, procede que emitamos el referido recurso en el ejercicio de nuestra jurisdicción original, para ordenarle a la Comisión Estatal de Elecciones que cumpla con el deber que tiene de observar las normas constitucionales pertinentes al conducir los procesos electorales a celebrarse en Puerto Rico próximamente. Como este asunto está explicado con meridiana claridad en la opinión mayoritaria, huelga hacer aquí pronunciamientos ulteriores sobre el particular.

**La Inconstitucionalidad de la Ley 403 del 10 de septiembre de 2000**.

Estoy conforme también con el dictamen de la mayoría del Tribunal, que declara inconstitucional la ley que se ha impugnado ante nos en el caso de autos. Por la importancia del asunto, sin embargo, deseo añadir unas expresiones propias sobre dicho asunto.

**A.** **La cuestión específica ante nos**

Antes que nada, es menester enfatizar qué es precisamente lo que nos toca resolver en este caso. Sobre todo debe quedar claro que **no** nos toca dilucidar aquí si es deseable o no que los puertorriqueños puedan votar por el Presidente de los Estados Unidos.

La Ley 403 que se ha impugnado ante este Tribunal **no** está dirigida a celebrar un referéndum para que los electores del país decidan si desean que se procure el voto presidencial para Puerto Rico o si no lo desean. Si la Ley 403 referida fuese de naturaleza plebiscitaria; es decir, si fuese un instrumento para que el pueblo votante decidiese el controversial asunto de si los puertorriqueños que residimos en la Isla deberíamos o no deberíamos reclamar el derecho al voto presidencial, entonces el caso de autos sería muy distinto al que tenemos ante nuestra consideración. Otras serían las consecuencias jurídicas en tal caso porque constitucionalmente es claro que el pueblo sí tiene derecho a expresarse para pasar juicio sobre si debe procurarse el voto presidencial o no.

Pero resulta que la Ley 403 no autoriza una consulta sobre el voto presidencial. Más bien dicha Ley va dirigida a que los ciudadanos americanos que residen en Puerto Rico en efecto ejerzan el voto presidencial. Mediante la Ley 403 se pretende viabilizar el supuesto derecho de los puertorriqueños a votar en las elecciones presidenciales. Por ello, el asunto preciso ante nuestra consideración es **si la Asamblea Legislativa y el Gobernador de Puerto Rico pueden autorizar por su cuenta una ley que concede el voto presidencial a los electores del país**, como han pretendido hacer el gobernador Rosselló y los legisladores de su partido al aprobar la

Ley 403 en cuestión. Lo anterior y nada más es lo que nos compete resolver en este caso.

### B. La falta de poder al amparo de la Constitución Federal

En derecho es claro que la actual mayoría legislativa de Puerto Rico y el gobernador Rosselló no tienen ningún poder al amparo de la Constitución de Estados Unidos para conceder por su cuenta el voto presidencial a los electores de Puerto Rico. En efecto, su actuación al aprobar la Ley 403 en cuestión constituye un acto ilegal y nulo que viola la Constitución norteamericana. Veamos.

El 13 de octubre de 2000, hace sólo unas semanas, el Tribunal de Apelaciones Para el Primer Circuito Federal resolvió, por **segunda vez** durante los pasados seis (6) años, que los ciudadanos de Estados Unidos que residen en Puerto Rico, no tienen derecho a votar en las elecciones presidenciales de la nación norteamericana.[12] De este modo, ese alto foro judicial federal, que tiene jurisdicción sobre

---

[12] Véase, Igartúa de la Rosa v. U.S., 2000 WL 1521203, del 13 de octubre de 2000; e Igartúa de la Rosa v. U.S., 32 F. 2d 8, del 17 de agosto de 1994.

el distrito federal de Puerto Rico, reiteró una vez más algo que es bien conocido por constitucionalistas puertorriqueños y norteamericanos: que se necesita enmendar la Constitución de los Estados Unidos, o que Puerto Rico se convierta en un estado de la Unión norteamericana, para que los ciudadanos de Estados Unidos que residen en Puerto Rico puedan votar en las elecciones presidenciales de esa nación.

El referido dictamen del Tribunal de Apelaciones para el Primer Circuito Judicial Federal **no es exclusivo de dicho foro**. Otros tribunales federales han decidido antes en términos similares. Lo hizo así un Tribunal de Distrito Federal de Nueva York el 7 de septiembre del 2000 en Romeu v. Cohen, 2000 WL 1264243 (S.D.N.Y.); lo hizo así, además, el Tribunal de Distrito Federal de Puerto Rico el 10 de junio de 1994 en Igartúa v. U.S., 842 F. Supp. 607, y antes en 1974 en Sánchez v. U.S., 376 F. Supp. 239; también lo ha hecho el Tribunal de Apelaciones para el Noveno Circuito Judicial Federal en 1984 en Guam v. U.S., 738 F. 2d 1017, cert. denied, 469 U.S. 1209 (1985). En todos estos casos y otros, que cubren un período de más de 25 años, varios foros federales distintos han resuelto una y otra vez que el voto presidencial sólo lo pueden ejercer los ciudadanos americanos que residan en un estado de la Unión, a menos que se enmiende la Constitución de Estados Unidos para conceder el derecho a tal voto, como sucedió en 1960 con respecto a los ciudadanos del Distrito de Columbia, la capital federal. El dictamen reciente del Tribunal de Apelaciones del Primer Circuito Judicial Federal, que reitera su idéntica decisión emitida seis (6) años antes, sólo alude, pues, a una realidad jurídica que está bien establecida y que es bien conocida en el derecho constitucional norteamericano. Esta realidad jurídica fue intimada por el propio Tribunal Supremo de Estados Unidos hace ya cerca de ochenta (80) años en Balzac v. Porto Rico, 258 U.S. 298 (1922), cuando el máximo foro judicial federal definió cuáles eran las consecuencias para los puertorriqueños de la ciudadanía americana que el Congreso de Estados Unidos había

concedido unos años antes. Quedó claro en esa decisión fundamental que la concesión de la ciudadanía referida **no conllevaba el derecho al voto presidencial** para los residentes en Puerto Rico. Desde esa época los puertorriqueños interesados en este asunto han conocido que no tienen derecho al voto presidencial si residen en Puerto Rico. También lo han sabido los juristas del patio y de Estados Unidos.

Es menester señalar que la realidad jurídica aludida antes **no la puede cambiar ni siquiera el Congreso de los Estados Unidos**. A pesar de los amplios poderes que ese magno cuerpo legislativo tiene tanto sobre las cuestiones electorales federales como sobre asuntos importantes de Puerto Rico, **no tiene poder para otorgarle el voto presidencial a los ciudadanos de Estados Unidos que residen en nuestro país**. El poderoso Congreso norteamericano sencillamente **no tiene la facultad** de concedernos el voto presidencial si Puerto Rico no se ha convertido en un estado de la Unión o si no se ha enmendado la Constitución federal a tales efectos. **Tampoco tienen los tribunales federales esa facultad**, como bien ha sido reiterado por el Tribunal de Apelaciones para el Primer Circuito Federal en su reciente decisión. El que algún juez federal criollo piense de otra forma es pura ilusión.

A la luz de la realidad jurídica anterior, la respuesta a la referida cuestión ante nuestra consideración es obviamente clara y sencilla: si el propio Congreso de Estados Unidos no tiene poder para concedernos el voto presidencial en nuestra situación actual, si los tribunales federales tampoco pueden otorgarnos ese voto, mucho menos puede hacerlo el gobernador Rosselló y la actual mayoría legislativa del país. Por ello la Ley 403 que se impugna ante nos en este caso no tiene ni puede tener ninguna legitimidad o validez. Su aprobación por la mayoría legislativa y por el gobernador Rosselló ha sido un acto *ultra vires*, y por ende nulo, por la sencilla razón de que se trata de un asunto sobre el cual la Asamblea Legislativa y el Gobernador **no tienen poder alguno**. Las ramas políticas del gobierno han actuado sobre algo que está en la actualidad totalmente fuera

de su alcance, que es totalmente ajeno a su ámbito de autoridad. Como la ley en cuestión gira en torno a un asunto que rebasa por mucho la facultad legislativa del gobierno actual de Puerto Rico, dicha ley es inconstitucional.

**C.** **La falta de poder al amparo de la Constitución de Puerto Rico**

Hay varias otras razones jurídicas importantes por las cuales la ley en cuestión es inválida e inconstitucional. Dos de ellas, que dimanan de nuestra propia Constitución y que son bien conocidas en los círculos jurídicos del país, ameritan resaltarse porque delatan la magnitud del disloque constitucional que pretendieron efectuar la mayoría legislativa y el gobernador Rosselló al aprobar la Ley 403 en cuestión.

Como se sabe, nadie duda que lograr el voto presidencial para Puerto Rico constituiría un cambio sustancial en la actual relación de nuestro país con la nación norteamericana. Pero resulta que tal cambio **sólo puede propiciarlo el pueblo mismo**. Conforme a nuestra Constitución, la Asamblea Legislativa y el Gobernador de Puerto Rico por sí solos no tienen la facultad de procurar el voto presidencial para Puerto Rico. Según hemos resuelto ya, en P.S.P. v. E.L.A., 107 D.P.R. 590 (1978), y más recientemente en Ramírez de Ferrer v. Mari Brás, res. el 18 de noviembre de 1997, 97 JTS 134, 144 D.P.R. ___ (1997), la facultad de aprobar medidas que afecten de modo importante la actual relación de la Isla con Estados Unidos le corresponde únicamente al propio pueblo de Puerto Rico. Nuestra Convención Constituyente, al aprobar la Constitución del Estado Libre Asociado de Puerto Rico, no le dio autorización o poder alguno a ninguna de las ramas de gobierno para resolver el **status** del país o para encaminarlo en determinada dirección. Sólo la ciudadanía en sí tiene facultad de pasar juicio sobre cualquier genero de modificación sustancial al status político de Puerto Rico.

Debe destacarse que el principio aludido, que le reserva al pueblo mismo la facultad sobre los cambios importantes de status,

es de aplicación específica al asunto del voto presidencial. Para algunos en el país, el voto presidencial es una prerrogativa que se apetece porque supuestamente le da mayor solidez y sentido a la unión permanente con Estados Unidos, que éstos apoyan decididamente. Para otros, en cambio, el voto presidencial constituye una grave amenaza a la nacionalidad, y a la autonomía política y fiscal de Puerto Rico. Para éstos, es una peligrosa medida asimilista que debe repudiarse. Unos y otros reconocen, sin embargo, que lograr el voto presidencial sería un cambio sustancial en la actual relación del país con Estados Unidos. Se trata, pues, de un asunto que involucra a fondo el **status** político de Puerto Rico, que sólo puede ser modificado por el pueblo mismo. **Así lo indicamos expresamente** en P.S.P. v. E.L.A., supra, a la pág. 609, al referirnos concretamente a que sería necesario celebrar un plebiscito para que el pueblo decidiese sobre la deseabilidad de buscar el voto presidencial.

En el caso de la Ley 403, la mayoría legislativa y el gobernador Rosselló han pretendido implantar el voto presidencial en Puerto Rico **sin el mandato del pueblo**. Han pretendido **usurpar** un poder que sólo le corresponde a la gente. Por ello, su actuación es ilegal, contraria a nuestra Constitución y nula.

III

Existe otro principio constitucional fundamental que ha sido violado al aprobarse la referida Ley 403 como se hizo.

Según lo hemos resuelto en muchas ocasiones, nuestra Constitución impone una obligación de **rigurosa neutralidad** a las instituciones de gobierno con respecto a las preferencias político-partidistas. El deber constitucional es claro: no se pueden usar los recursos públicos para adelantar las causas político-partidistas. En distintos contextos hemos insistido en que los fondos públicos y los cargos e instituciones gubernamentales no se pueden utilizar para favorecer las preferencias políticas particulares de los que administran esos fondos o de los que ostentan

dichos cargos. Tal proceder de las autoridades públicas es impermisible tanto porque viola el requisito constitucional de que los recursos públicos **sólo pueden usarse para fines públicos**, como porque viola el **postulado de igualdad** inmerso en nuestra Constitución, que exige que el Estado le dé un trato esencialmente igual a todas las opciones político-partidistas que sean legítimas. Como hemos señalado antes, la verdadera esencia de un gobierno libre y democrático consiste en ejercer los cargos públicos como una fiducia, encomendada para el bien común del país y no para beneficio de determinada ideología o partido político. Partido Popular Democrático v. Rosselló, res. el 22 de diciembre de 1995,  95 JTS 139, 165 D.P.R. ___ (1995); Marrero v. Mun. de Morovis, 115 D.P.R. 643 (1984); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984); P.S.P. v. Srio. de Hacienda, 110 D.P.R. 313 (1980). El partido que ostenta el poder de gobernar al país en un momento dado, pues, no puede usar ese poder o los fondos públicos para promover sus posturas políticas particulares. Actuar de tal forma constituye un atropello contra el derecho de los demás electores del país a promover sus propias posturas. Representa usar los fondos aportados por los demás electores para combatir las causas que éstos favorecen. Ese tipo de ventajería está tajantemente prohibida por nuestra Constitución.

En el caso de autos, el gobernador Rosselló y la mayoría legislativa violaron crasamente la Constitución de Puerto Rico al aprobar la ley que se ha impugnado en este caso. Advertidos en las vistas públicas que celebró la Asamblea Legislativa sobre dicha ley, y en otros foros y por otros medios, de que no podía legislarse el voto presidencial referido, y carente hasta del más mínimo consenso político sobre una cuestión electoral de tan gran transcendencia, la actuación de las referidas ramas de gobierno constituye un abuso crudo del poder que tienen, que han pretendido utilizar para adelantar así sus causas e intereses político-partidistas. Con tal proceder violaron el mandato de neutralidad que le impone la Constitución.

IV

El proceder del gobernador Rosselló y de la mayoría legislativa al aprobar la Ley 403 en cuestión, que tiene tantos defectos constitucionales, es muy reprochable y debe ser conjurado por este Tribunal de inmediato.

Desde el punto de vista de la buena convivencia democrática, Puerto Rico atraviesa por una de las peores épocas de su historia. No son solamente los graves males de la criminalidad y la corrupción los que andan rampantes en el país. Prevalecen en extremo también el cinismo político, el tribalismo y la trivialidad. Gruesas tinieblas opacan el horizonte espiritual de nuestro pueblo. En estas circunstancias tan aciagas, el proceder gubernamental referido no tiene nada de edificante. Por el contrario, sólo sirve para agravar la aguda crisis moral que aflige a nuestra polis. Con el proceder aludido las más notorias figuras públicas le han dado un pésimo ejemplo al país. En lugar de sentar pautas que eleven la civilidad del pueblo, se le ha comunicado a la gente que la falsedad y la ventajería están en orden. Se promueve así la proliferación de sujetos taimados, en lugar de la de personas dignas y honorables. No se cultiva el apego al bien común, sino la sujeción a la arrogancia del poder. Se trata, en el mejor de los casos, de un comportamiento aventurero, desdeñoso de los derechos de los demás, que sólo sirve para zahondar la tan resquebrajada solidaridad de nuestro pueblo y para sofocar las posibilidades de una convivencia serena y de verdadera paz en nuestra comunidad.

Los que ostentan el poder político para actuar de este modo tan poco legítimo defraudan la esencia del liderato auténtico. Terminan socavando hasta sus más manidas metas. Porque poco pueden predicar la mano dura contra el crimen los que se burlan del ordenamiento constitucional; porque poco pueden potenciar a la gente los que administran con soberbia y discordia el poder que se les ha delegado.

Es por todas estas razones que este Tribunal está compelido a actuar **ahora**, sin más dilación, para declarar inconstitucional una

ley tan fallida e inusitadamente nula como lo es la Ley 403 en cuestión.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Damaris B. Mangual Vélez      *
y Otros                       *
                              *
        Peticionarios         *
                              *
            v.                *
                              *
Comisión Estatal de Elecciones *        MD-2000-9
y Otros                       *
                              *
        Demandados            *
********************************  *
Eudaldo Báez-Galib            *
                              *
        Demandante            *
                              *
            v.                *
                              *
Comisión Estatal de Elecciones *        MD-2000-8
y E.L.A.                      *
                              *
        Demandados            *
********************************  *

Opinión Disidente emitida por el Juez Asociado señor Corrada del Río

San Juan, Puerto Rico, a 2 de noviembre de 2000.

Los peticionarios en este caso son el Lcdo. Eudaldo Báez Galib, por derecho propio como elector y como Presidente del Partido Demócrata del Estado Libre Asociado;[13] y Damaris B. Mangual Vélez y otros[14] (en

---

[13] *Eudaldo Báez Galib v. C.E.E. y E.L.A.*, Petición de Mandamus, Caso Núm. MD-2000-8, radicado ante este Tribunal el 13 de septiembre de 2000. El Lcdo. Eudaldo Báez Galib comparece como ciudadano y elector alegadamente al amparo de los derechos dados por la Ley Electoral de Puerto Rico, Artículo 2.001, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. 3051. En esta capacidad, alega también que puede exigir que los organismos se administren dentro de un marco de estricta imparcialidad y pureza, conforme a 16 L.P.R.A. 3051, y *Sánchez y Colón v. E.L.A. I*, 134 D.P.R.443 (1993); *P.I.P. v. C.E.E.*, 120 D.P.R. 580

**continúa...**

[1] **...continuación**
(1988). El Lcdo. Báez Galib ha comparecido también como Presidente del "Partido Demócrata del Estado Libre Asociado", alegando que tiene legitimidad activa en esta calidad basado en que dirige los procedimientos de dicho Partido Nacional en Puerto Rico, conforme al Art. 1.003 (40), Ley Electoral, *supra*, 16 L.P.R.A. 3003 (40). Los demandados-requeridos en este caso son el Estado Libre Asociado de Puerto Rico, representado por el Procurador General de Puerto Rico, y la Comisión Estatal de Elecciones.
[14] *Damaris B. Mangual Vélez, et al v. C.E.E et al.*, Petición de Mandamus, MD-2000-9, radicado ante este Tribunal el 19 de octubre de 2000. Los demandantes son las siguientes personas.: Damaris B. Mangual Vélez comparece como electora debidamente inscrita y Comisionada Electoral del Partido Independentista Puertorriqueño,

y como tal, miembro de la Comisión Estatal de Elecciones. Pedro Martínez Agosto comparece como elector debidamente inscrito y Director Auxiliar de Operaciones Electorales, que es el área de la C.E.E. donde se ensamblan los maletines que contienen las papeletas y demás material electoral relativo a la votación presidencial. Irma Rodríguez Morales comparece como electora debidamente inscrita y como Subsecretaria de la C.E.E., en el área de exclusiones. Maribel Arroyo Rodríguez comparece como electora debidamente inscrita y representante del Partido Independentista Puertorriqueño (P.I.P.) en la Junta Administrativa de Voto Ausente. Rosalina Vega Rivera comparece ante nos como electora debidamente inscrita, y también como Comisionada en Propiedad del P.I.P. en la Comisión Local de Elecciones del Precinto 65 de Corozal, Puerto Rico. Por último, Carlos Aner Navarro Carrasquillo comparece como funcionario de colegio electoral por el 0P.I.P. en el Precinto 2 de San Juan.

Por otro lado, los demandados-requeridos en este caso son: la Comisión Estatal de Elecciones; Juan R. Melecio, Presidente de la C.E.E.; Pedro Figueroa Costa, Comisionado Electoral del Partido Nuevo Progresista (P.N.P.), y como tal, miembro de la C.E.E.; y Carlos López Feliciano, Comisionado Electoral del Partido Popular Democrático, y como tal, miembro de la C.E.E.

**El demandado, Sr. Carlos López Feliciano, Comisionado Electoral del Partido Popular Democrático, se allanó a la demanda** y a esos efectos presentó ante este Tribunal una moción titulada "Comparecencia Especial del Comisionado

**continúa...**

---

[2] **...continuación**
Electoral del Partido Popular Democrático" el 25 de octubre de 2000.

adelante, nos referiremos a ellos colectivamente como "peticionarios").[15] Estos presentaron ante nos sendos recursos titulados "Petición de Mandamus" invocando nuestra jurisdicción original.

En síntesis, los peticionarios nos han solicitado que declaremos inconstitucional la Ley 403 de 10 de septiembre de 2000, conocida también como la Ley de Elecciones Presidenciales en Puerto Rico. Además, solicitaron que expidamos un auto de *mandamus* dirigido a la Comisión Estatal de Elecciones ("C.E.E."), su Presidente y sus miembros, para que procedan de inmediato con todas las gestiones necesarias para la celebración de las elecciones generales del 7 de noviembre de 2000 *sin poner en vigor lo dispuesto en la Ley de Elecciones Presidenciales en Puerto Rico.*

El 20 de octubre de 2000 emitimos una resolución requiriéndole a las partes que se expresaran sobre los siguientes asuntos: (a) la procedencia del vehículo procesal de mandamus utilizado en este caso; (b) la jurisdicción de este Tribunal a la luz del caso de *Gregorio Igartua de la Rosa v. United States of America*, No. 00-2083, en aquel momento aún pendiente ante la Corte de Distrito Federal;[16] y (c) sobre cualquier otro asunto que se desee plantear por las partes. El 26 de octubre de 2000 le requerimos al Procurador General y las demás partes expresarse sobre la constitucionalidad de la ley objeto de impugnación, luego que asumiéramos jurisdicción en el asunto. Las partes han comparecido. Procedemos a resolver.

I

---

[15] El 25 de octubre de 2000 compareció el Estado Libre Asociado, representado por el Procurador General, solicitando, entre otras cosas, la consolidación de los recursos Núm. MD-2000-8 y Núm. MD-2000-9 por ser idénticos. Mediante resolución emitida el 26 de octubre de 2000, ordenamos la consolidación de los recursos.

[16] Este asunto de jurisdicción, propiamente relacionado a cuestiones de federalismo, se tornó académico durante el transcurso del término concedido a las partes debido a que el 23 de octubre de 2000 la Corte de los Estados Unidos para el Distrito de Puerto Rico notificó una orden devolviéndole la jurisdicción sobre éste y otros casos pendientes al Tribunal General de Justicia de Puerto Rico. Véase copia de esta resolución adjunta a la "Moción Solicitando Continuación de Procedimientos", radicada en autos por el

El 29 de agosto de 2000 la Corte de los Estados Unidos para el Distrito de Puerto Rico, en el caso de *Igartua de la Rosa v. United States*, ___ F.Supp.2d ___, 2000 WL 1300356 ("*Igartua I*"), resolvió mediante sentencia tres asuntos: (1) que los ciudadanos de los Estados Unidos domiciliados en Puerto Rico eran acreedores del derecho de votar por el Presidente y Vicepresidente de los Estados Unidos, y que esos votos deberían ser contados por el Congreso de los Estados Unidos; (2) que el Gobierno de

---

peticionario, Lcdo. Eudaldo Báez Galib, el 24 de octubre de 2000, en la Petición de *Mandamus*, caso Núm. MD-2000-8.

Puerto Rico tenía la obligación de actuar apresuradamente para instrumentar el medio a través del cual los ciudadanos estadounidenses domiciliados en Puerto Rico pudiesen ejercer el voto presidencial en las elecciones presidenciales a celebrarse en el mes de noviembre de 2000, y en futuras elecciones presidenciales, y además, tenía la obligación de proveer para la designación de compromisarios presidenciales ("Presidential electors"); por último, (3) ordenó al Gobierno de Puerto Rico que le informara sobre todo lo relacionado al desarrollo de la implementación de la elección presidencial hasta que todos los votos fueren contados conforme a la Duodécima Enmienda de la Constitución de los Estados Unidos. *Igartua I*, *supra*, pág. 14.

Consiguientemente, el Gobernador de Puerto Rico convocó a la Asamblea Legislativa a una sesión extraordinaria con el objetivo principal de instrumentar el voto presidencial ordenado por la Corte de Distrito de los Estados Unidos en el caso de *Igartua I, supra*. Mientras tanto, el Ministerio Fiscal federal gestionaba los preparativos para apelar la sentencia emitida ante la Corte de Circuito de Apelaciones de los Estados Unidos para el Primer Circuito.[17]

El 10 de septiembre de 2000 entró en vigor la "Ley de Elecciones Presidenciales en Puerto Rico", Ley Núm. 403 del 10 de septiembre de 2000 ("Ley 403").[18] En síntesis, dicha ley tiene como finalidad

---

[17] El Ministerio Fiscal de los Estados Unidos presentó un recurso de apelación ante dicha corte el 11 de septiembre

continúa...

[5] ...**continuación**

de 2000, solicitando la revocación de la sentencia emitida el 29 de agosto de 2000 por la Corte de Distrito. Alegó, en esencia, que el dictamen de la Corte inferior era contrario a la doctrina constitucional federal vigente, ya establecida por el Primer Circuito previamente en *Igartua de la Rosa v. U.S.*, 32 F.3d 8 (C.A. 1, 1994). Por lo tanto, invocó la doctrina de *stare decisis*.

[18] Dicha ley dispone que "[l]a Comisión Estatal [de Elecciones] tendrá la responsabilidad de organizar, implantar y viabilizar los procesos para la elección presidencial en la jurisdicción del Estado Libre Asociado de Puerto Rico" y a esos efectos "autoriza el uso de los recursos, equipo, propiedad mueble e inmueble, así como de los empleados y funcionarios adscritos a la Comisión, que sean necesarios para llevar a cabo todos los procesos y actividades relacionadas con dicha elección". Art. 1.3, Ley 403. La Ley 403 ordena además a la C.E.E. a proveer los mecanismos para la elección de ocho (8) compromisarios que deberán reunirse en El Capitolio en diciembre de 2000 para votar por el Presidente y Vicepresidente de los Estados Unidos, Art. 2.1, de manera que dichos

instrumentar el voto presidencial de los ciudadanos estadounidenses domiciliados en Puerto Rico que interesen así expresarse en las urnas electorales. La Ley 403, con vigencia inmediata, dispone que la Comisión Estatal de Elecciones ("C.E.E.") tendrá la responsabilidad de organizar e instrumentar dicha elección

---

resultados se le remitan al Presidente del Senado de los Estados Unidos para que éste cuente dichos votos cuando se vaya a elegir al Presidente de los Estados Unidos. Art. 3.13.

La Ley 403 faculta al Presidente de la C.E.E. realizar todas las gestiones necesarias para elegir los compromisarios, y le instruye que debe adoptar reglas y reglamentos, diseñar y producir formularios, imprimir papeletas, preparar, producir y distribuir listas electorales, adquirir e instalar urnas electorales, escrutar votos y certificar resultados de la elección. Además le ordena a que en unión a unos funcionarios electorales que según la Ley 403 deben designar los candidatos a Presidente y Vicepresidente de los Estados Unidos, que desarrolle y ejecute una "campaña de información y orientación al elector sobre la celebración de las elecciones presidenciales en Puerto Rico". La Ley 403 ordena que el contenido de dicha campaña tiene que promover la participación del electorado puertorriqueño en la elección presidencial y tiene que orientar al elector sobre la forma en que deberá marcar la papeleta para

**continúa...**

[6] **...continuación**

consignar su voto. Según la Ley, para dicha campaña el Presidente de la C.E.E. debe utilizar todos los medios de comunicación y técnicas de difusión pública a su alcance, incluyendo la divulgación a través de los medios televisivos y la Internet. Art. 3.5, Ley 403. A estos fines se le asignó a la C.E.E. un total de $900,000 dólares para organizar e implantar la elección presidencial. Art. 4.3, Ley 403.

La Ley 403 establece que la elección presidencial se celebrará conjuntamente con la elección general de Puerto Rico. Contempla que a cada elector o electora se le entregará una cuarta papeleta para que éste o ésta emita su voto, y lo deposite en una cuarta urna que se dispondrá para estos fines en cada colegio electoral. La administración del proceso de votación en cada colegio se le encomienda a las Juntas de Colegio que existen de conformidad con la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, conocida como "Ley Electoral de Puerto Rico", 16 L.P.R.A. sec. 3001 *et seq*.

La Ley 403 dispone en su artículo 4.1 que "toda persona que obrare en contravención de cualesquiera de las disposiciones de esta Ley, o que teniendo una obligación impuesta por la misma, voluntariamente deje de cumplirla, o se negare a ello, incurrirá en delito electoral y convicta que fuere será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares, o ambas penas a discreción del Tribunal.

Sin embargo, sobre este "delito electoral" tipificado en el artículo 4.1 de la Ley 403 debemos añadir lo siguiente. Ya desde el año 1977 la Ley Electoral tipifica el "delito electoral" disponiendo que "[t]oda persona que, a sabiendas y fraudulentamente, obrare en contravención de cualesquiera de las disposiciones de [la Ley], o teniendo una obligación impuesta por [la] misma, voluntariamente dejare de cumplirla, o se negare a ello, será culpable de delito electoral y . . . . será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares, o ambas penas a discreción del tribunal". Artículo 8.004, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. sec. 3354. La Ley de Primarias Presidenciales Compulsorias también provee idéntica prohibición y penalidad. *Véase* Ley Núm. 6 de 24 de septiembre de 1979, según enmendada, 16 L.P.R.A. sec. 1351.

Por último, el artículo 4.4 de la Ley 403 claramente establece ordena que "[l]os resultados de las votaciones

**continúa...**

[6] **...continuación**

efectuadas al amparo de esta Ley y el número de participantes en la misma no podrá interpretarse como una expresión a favor ni en contra de ninguna fórmula de *status* político ni como tendiente a modificar

presidencial, que habría de celebrarse conjuntamente con la elección general.[19] Sobre este particular, el artículo 4.3 de la Ley 403, asigna la cantidad de $900,000 dólares para la implantación del proceso sobre el voto presidencial. Es importante señalar además que el artículo 4.4 de la Ley 403 establece que:

> **[l]os resultados de las votaciones efectuadas al amparo de esta Ley y el número de participantes en la misma no podrá interpretarse como una expresión a favor ni en contra de ninguna fórmula de status político ni como tendiente a modificar en forma alguna la relación política entre Puerto Rico y Estados Unidos de América**. (Énfasis suplido).

Posteriormente, el 13 de octubre de 2000, la Corte de Circuito de Apelaciones de los Estados Unidos para el Primer Circuito emitió sentencia revocando la decisión

---

en forma alguna la relación política entre Puerto Rico y Estados Unidos de América".
[19] Art. 1.3 de la Ley 403.

emitida el 29 de agosto de 2000 por la Corte de Distrito. *Véase Igartua de la Rosa v. U.*S., ___ F.3d ___, 2000 WL 1521203 (en adelante, *Igartua II*). En esencia, dicha corte resolvió que los ciudadanos estadounidenses domiciliados en Puerto Rico no tienen derecho a votar por el Presidente y Vicepresidente de los Estados Unidos.[20] Los peticionarios arguyen que a consecuencia de esta sentencia revocatoria, el único propósito de la Ley 403 es intentar implementar un derecho que "no existe". Consecuentemente –alegan éstos– la Ley 403 carece de "fin público", elemento indispensable para la validez de toda pieza legislativa bajo la Constitución de Puerto Rico. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *P.S.P. v. C.E.E.*, 107 D.P.R. 590 (1978).

Primeramente, nos corresponde resolver un asunto procesal de importancia; a saber, si procede el auto de *Mandamus* para resolver este caso, mediante el ejercicio de nuestra jurisdicción original. A nuestro entender, no procede el auto de *Mandamus*. Veamos.

II

La Constitución del Estado Libre Asociado de Puerto Rico dispone en su Artículo V, Sección 5, que "[e]l

---

[20] Sin embargo, la Corte aclaró que no adjudicaría, ni adjudicó, la validez de la Ley 403 bajo el derecho de Puerto Rico: "This Court, of course, expresses no opinion with regard to the validity under Puerto Rican law of Law No. 403." *Igartua II*, *supra*, p.3.

Tribunal Supremo . . . podrá[] conocer en primera instancia de recursos de hábeas corpus y de aquellos otros recursos y causas que se determinen **por ley**.[21] Constitución del Estado Libre Asociado de Puerto Rico, 1 L.P.R.A. Art. V, Sec. 5. Consecuentemente, el Código de Enjuiciamiento Civil, artículo 649, 32 L.P.R.A. 3421, dispone que el Tribunal Supremo está autorizado para dictar el altamente privilegiado auto de *mandamus*:[22]

> El auto de *mandamus* es un auto altamente privilegiado dictado por el Tribunal Supremo del Estado Libre Asociado . . . y dirigido a alguna persona o personas naturales, a una corporación o a un tribunal judicial de inferior categoría, dentro de su jurisdicción requiriéndoles para el cumplimiento de sus atribuciones o deberes. Dicho auto no confiere nueva autoridad y la parte a quién obliga deberá tener la facultad de poder cumplirlo.[23]

El *mandamus* es pues un recurso para requerirle a un funcionario el cumplimiento de un acto que la ley le ordena cuando ese deber no admite discreción en su ejercicio, sino que es ministerial. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Espina v. Calderón, Juez, y Sucn. Espina, Int.*, 75 D.P.R. 76 (1953); *García v. Vivas*, 67 D.P.R. 835, 837 (1947); *Great American Indemnity v. Gobierno de la Capital*, 59 D.P.R. 911, 913 (1941); *Pueblo v. La Costa, Juez*, 59 D.P.R. 179 (1941); D. Rivé Rivera, *Recursos* Extraordinarios, San Juan, Universidad Interamericana, 1996, pág. 107. En fin, "[e]l recurso de mandamus sólo procede para exigir el cumplimiento de un deber impuesto por la ley, es decir de un deber calificado de 'ministerial'". *Espina v. Calderón, Juez, y Sucn. Espina, Int.*, *supra*, pág. 84.

---

[21] Art. V, Sec. 5 de la Constitución del E.L.A (énfasis suplido).
[22] Así también lo instrumenta el artículo 16 del Reglamento de este Tribunal, 4 L.P.R.A. Ap.XXI-A, R.16, que en lo pertinente dispone lo siguiente:

Regla 16 – Procedimiento en acciones de jurisdicción original

1)(a) Esta Regla es aplicable a casos de *hábeas corpus*, *mandamus* . . . y aquellos otros en que se confiere jurisdicción original a este Tribunal.
2)(b) Las acciones de jurisdicción original se regirán por las disposiciones pertinentes del Código de Enjuiciamiento Civil . . . .

Esta no es la primera ocasión que ante nos surge una situación en donde unos peticionarios invocan nuestra jurisdicción original mediante un auto titulado de *mandamus* inválidamente, con el propósito de obtener una sentencia declaratoria e *injunction*; es decir, para que exijamos el cumplimiento de una obligación negativa o de no hacer.[24] *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402 (1991); *El Vocero v. C.E.E.*, 130 D.P.R. 525 (1992).[25]

En *Gierbolini Rodríguez v. Gobernador*, *supra*, un grupo de ciudadanos votantes invocó nuestra jurisdicción original mediante un recurso titulado "Petición de *Injunction* Permanente y Otros Remedios en Jurisdicción Original", pero que se proyectaba como una petición de *mandamus*. Solicitaron de este Tribunal que ordenásemos a la C.E.E. que, en cumplimiento de la Ley Electoral, no celebrara el *referéndum* de "Derechos Democráticos" pautado para el 8 de diciembre de 1991, según lo dispuso la Ley Núm. 85 de 9 de septiembre de 1991 y la Ley Núm. 86 de 2 de octubre de 1991, aprobadas en sesión extraordinaria convocada por el entonces Gobernador, el Honorable Rafael Hernández Colón. Leyes de Puerto Rico, 1991, Parte I, pág. 811. El remedio perseguido por estos ciudadanos era propiamente la declaración de inconstitucionalidad de la ley del *referéndum* de "Derechos Democráticos", o sea, declarar "ultra vires" los actos de los funcionarios de la C.E.E.; algo que era obtenible solamente mediante el remedio de sentencia declaratoria, sobre el cual este

---

[23] 32 L.P.R.A. § 3421.

[24] El Juez Asociado señor Rebollo López ha denominado este recurso como auto de "mandamus negativo". *Véase Gierbolini Rodríguez v. Gobernador*, *supra*, pág. 468.

[25] En *Nogueras Cartagena v. Rexach Benítez I*, __ D.P.R.__, sentencia de 30 de agosto de 1996, 96 T.S.P.R. 125, 96 J.T.S. 112 resolvimos mediante **sentencia, sin opinión,** un

continúa...

[13] **...continuación**

recurso de *mandamus* en los méritos para que se declarara inconstitucional el acto de expulsar a un miembro del Senado de Puerto Rico. Reiteramos, sin embargo, la norma de que las sentencias de este Tribunal no tienen valor de precedente, aunque se hayan publicado por razón de que un Juez de este Tribunal haya certificado una opinión concurrente o disidente o un voto particular. Por lo tanto, se considerará inapropiado citarlas como autoridad o precedente de este Tribunal Supremo. *Rivera Maldonado v. E.L.A.*, 119 D.P.R.74 (1987).

Tribunal carecía, y todavía carece, de jurisdicción original. *Véase* 32 L.P.R.A. § 3421.

En aquella ocasión desestimamos la petición "[p]or carecer este Tribunal de jurisdicción original para considerar una petición de *injunction* y por no reunir el recurso los requisitos de una petición de *mandamus*". *Gierbolini Rodríguez v. Gobernador*, *supra*, pág. 403. Resulta obvia la marcada inconsistencia de este Tribunal al declinar el ejercicio de su jurisdicción original por vía de *mandamus* en el caso del *referéndum* de "Derechos Democráticos", convocado en 1991 bajo la administración del Honorable Rafaél Hernández Colón y el ejercicio inusitado e impropio de esa jurisdicción original en el caso ahora ante nos.

Posteriormente, en *El Vocero v. C.E.E.*, *supra*, se presentó un recurso convenientemente titulado "Solicitud de *Mandamus*", pidiendo que se declarara nulo y contrario a la Ley Electoral un reglamento de la C.E.E. que permitía que los candidatos a puestos electivos radicaran en la C.E.E. sus estados de situación económica sin necesidad de estar auditados. Resolvimos en aquella ocasión que la solicitud "de *mandamus*" del peticionario no estaba realmente dirigida a que la C.E.E., o sus funcionarios, cumplieran con un deber ministerial, sino que en realidad pedía que se declarara la nulidad del reglamento aprobado por la C.E.E., por lo que era improcedente.

En *Márquez v. Gierbolini*, 100 D.P.R. 839 (1972), habíamos establecido una norma objetiva y apropiada. Dijimos que los litigantes no deben valerse del recurso de *mandamus* para intentar lograr que consideremos la constitucionalidad de una ley en jurisdicción original, y además una orden de no hacer, tal como si se tratase de un recurso de sentencia declaratoria y de *injunction*. Reiteramos hoy lo expresado allí por el Juez Asociado señor Dávila ante una situación análoga:

> La importancia que pueda tener una cuestión para un litigante no concede jurisdicción a un tribunal para conocer de un pleito si la ley no la establece. Respetar la ley, tanto la que gobierna la conducta de los individuos como la que gobierna

la función de un tribunal, es fundamental para la permanencia de un gobierno de ley.[26]

"En otras palabras no se puede utilizar el recurso [de *mandamus*] cuando previamente hay que determinar la constitucionalidad de una ley o de un acto administrativo, ni, por supuesto, para obligar a cumplir un acto, o una ley, inconstitucional". D. Rivé Rivera, *op. cit*, págs. 108-109.

En su recurso los peticionarios se han limitado a

---

[26] *Márquez v. Gierbolini*, *supra*, pág. 841 (Opinión concurrente).

argumentar que el *mandamus* es el remedio más apropiado para garantizar la integridad del proceso eleccionario el próximo 7 de noviembre de 2000, es decir, para garantizar el cumplimiento de la Ley Electoral, sin la interferencia inconstitucional del proceso que viabiliza la Ley 403. Por ello, concluyen, debemos admitir el recurso y conceder lo solicitado, adjudicando así los méritos.[27] No tienen razón. Debemos declinar la invitación que nos hacen los peticionarios en este caso a expandir *motu proprio* la

---

[27] Por otro lado, los peticionarios alegan que este caso cumple con todos los factores necesarios establecidos en nuestra jurisprudencia para ejercer nuestra jurisdicción original. Los reiterados factores usados para guiar nuestra discreción al decidir si debemos ejercer nuestra jurisdicción original son los siguientes: (1) si el recurso se dirige contra principales funcionarios del gobierno; (2) si se señalan cuestiones de gran interés público; y (3) si el problema planteado requiere una resolución pronta y definitiva. *Véase Baez Galib v. Roselló Gonzalez*, __ D.P.R. __, res. de 22 de enero de 1999, 99 T.S.P.R. 3, 99 J.T.S. 1; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 411 (1982); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264, 247-75 (1960), y casos allí citados.

Si bien es cierto que hoy reiteramos estos factores, debemos aclarar, sin embargo, que la aplicación de estos factores presupone, desde luego, la adecuada presentación ante este Tribunal de un recurso perfeccionado, conforme al artículo 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. § 3421. En otras palabras, ninguno de estos factores deberá ser considerado sin que antes se haya presentado y perfeccionado ante nos uno de los cuatro (4) recursos jurisdiccionales establecidos en el antedicho articulado (i.e., *habeas corpus*, *mandamus*, *auto inhibitorio*, y *quo warranto*); algo que claramente no ha sucedido en este caso. No será propio invocar, ni tampoco analizaremos dichos factores cuando del recurso surja que se ha encabezado como uno de *habeas corpus*, *mandamus*, *auto inhibitorio*, o *quo warranto* por razones de conveniencia procesal.

jurisdicción original de este Tribunal. Incuestionablemente, este Tribunal al así hacerlo viola el Artículo V, Sección 5 de nuestra Constitución que establece que la jurisdicción original de este Tribunal será determinada por ley. Transgrede además las normas establecidas en nuestro derecho en un ejemplo claro de "activismo judicial" funesto para nuestra vida democrática de pueblo y nuestras libertades civiles.[28]

Por lo tanto, debiéramos desestimar por falta de jurisdicción. No obstante, aunque reiteramos que la ley no nos concede jurisdicción, este Tribunal impropia e inusitadamente la asumió; por ello disentimos firmemente.

III

Dado que el Tribunal ha asumido jurisdicción nos vemos precisados a discutir los méritos de la controversia planteada. Primeramente, los peticionarios alegan que la Ley 403 le impone obligaciones legales relacionadas con la elección presidencial, a pesar de que se oponen por razones ideológicas a la celebración de dicha elección presidencial en Puerto Rico.[29]

---

[28] El reconocimiento de la procedencia del "*mandamus* negativo" por este Tribunal hoy produce un resultado claramente anómalo y absurdo: a saber, expande la jurisdicción original de este Tribunal, en clara contravención al ordenamiento legal vigente. Disentimos por lo tanto, entendiendo que es más sabia la norma constitucional firmemente establecida y que hasta hoy regía en este Tribunal: a saber, que la jurisdicción y/o competencia original de este Tribunal será determinada exclusivamente por la Asamblea Legislativa, Art. V, Sec. 2, Const. del E.L.A., *Chamberlain v. Delgado*, 82 D.P.R. 6 (1960), *Rodríguez v. Registrador*, 75 D.P.R. 712 (1953).

[29] Algunos de los peticionarios también alegan que debido a las obligaciones que les impone la Ley 403, sus funciones en la Comisión Estatal de Elecciones ya se están viendo afectadas, o se verán afectadas el día de las elecciones debido a que el trabajo en la C.E.E. "se encuentra atrasado debido a la inclusión, en bolsa separada, de las papeletas y demás material electoral relativo a la votación presidencial", o "por la extensión de tiempo para que se pudiera inscribir para votar ausentes aquellas personas que no se hubieren inscrito para votar en las elecciones generales, o "debido a las inscripciones y exclusiones de voto ausente que se impuso como resultado de la votación presidencial . . .". *Véase* "Petición de Mandamus", MD-2000-9, p. 4. Rechazamos este argumento por frívolo.
En el supuesto de que aceptásemos la alegación de que la cantidad de trabajo de los peticionarios ha aumentado --o aumentará en algún futuro cercano-- debido a la Ley 403 y que consecuentemente el trabajo se encuentra atrasado, aún así, eso no sería base razonable ni suficiente para impugnar la constitucionalidad de dicha ley. Conocida es la doctrina de legitimidad activa que exige que se alegue

El argumento no es complicado. En síntesis, arguyen que como funcionarios de la C.E.E. la Ley 403 les ha impuesto una obligación de participar en los preparativos de un proceso que ellos objetan por ser contrario a sus creencias ideológicas y políticas. Claramente, este argumento no es defendible.

Que los peticionarios se opongan a la elección presidencial por razones ideológicas no los exime del cumplimiento de la ley. De otro modo, idéntico argumento muy bien podrían idear muchos miembros y funcionarios de la C.E.E. con respecto a los preparativos que cada año eleccionario efectúan no tan sólo en beneficio de los partidos políticos de su predilección, sino también en beneficio de los partidos que son institucionalmente opuestos a sus preferencias políticas e ideológicas. Nada sería más contrario a la razón y, por supuesto, a los propósitos que persigue una institución como la C.E.E. dentro de nuestra democracia.

Descartado este argumento, pasamos a considerar los argumentos constitucionales que, según nuestro entender, requieren un juicio mucho más reflexivo.

El planteamiento de los peticionarios de que la Ley 403 es inconstitucional se fundamenta esencialmente en dos premisas: 1) Plantean primero que la Ley 403 viola el Artículo II, Sección 19 de la Constitución de Puerto Rico debido a que alegadamente la referida ley tiene como fin "alterar la relación de poder entre Puerto Rico y Estados Unidos, sin que el pueblo lo haya autorizado".[30] Sostienen que supuestamente se trata de "un área en la que el pueblo se reservó toda la autoridad".[31] Además, plantean que la Ley 403 es

---

y demuestre un daño suficientemente real, inmediato, claro, preciso, palpable, e inminente. *Colegio de Peritos Electricistas v. Autoridad de Energía Eléctrica*, __ D.P.R.__, res. de 22 de febrero de 2000, 2000 T.S.P.R. 28, 2000 J.T.S. 43.

Adicionalmente, los peticionarios han hecho un esfuerzo por persuadirnos de que el "delito electoral" tipificado en el artículo 4.1 de la Ley 403 los coacciona a cumplir con la dicha ley bajo amenaza de sanción penal, y en contra de sus creencias políticas e ideológicas. No tienen razón ni nos persuaden. Idéntica disposición ha existido desde el año 1977 bajo la Ley Electoral (art. 8.004) y la Ley de Primarias Presidenciales Compulsorias (art. 27), ambas de reconocida validez constitucional a raíz del caso de *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988).

[30] Petición de *Mandamus*, MD-2000-9, págs. 5-6.
[31] *Id.*

inconstitucional porque pretende "implantar ficticiamente un derecho legal inexistente",[32] o sea, el derecho al voto presidencial.

2) En segundo lugar, los peticionarios plantean que la Ley 403 viola el Artículo VI, Sección 9 de la Constitución de Puerto Rico ya que autoriza la disposición de propiedad y fondos públicos para un fin que no es público: esto es, para "la celebración de una elección que no tendrá efecto jurídico alguno en la realidad",[33] o que "no produce derecho".[34] Ninguno de estos dos planteamientos es procedente, sobre todo a la luz de la jurisprudencia interpretativa sobre estas disposiciones constitucionales.[35] Véanse *P.I.P v. C.E.E.*, 120 D.P.R. 580 (1988); *P.I.P. v. E.L.A.*, 109 D.P.R 403 (1980); y *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). Veamos.

1) *La Ley 403 no viola el Artículo VI, Sección 9 de la Constitución de Puerto Rico*

El Artículo VI, Sec. 9 de nuestra Constitución ordena:

> Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.

---

[32] *Id.*
[33] *Id.*, pág. 6.
[34] Petición de *Mandamus*, MD-2000-8, pág. 5.
[35] Los peticionarios hacen otro planteamiento constitucional adicional que requiere nuestra breve atención: esto es, que la Ley 403 "violenta el principio constitucional de la igualdad económica electoral implícito en el Artículo VI, Sección 9, de la Constitución". Petición de *Mandamus*, MD-2000-9, pág. 6. Luego de haber examinado los casos citados por los peticionarios, concluimos que ninguno es aplicable al caso de marras. El principio de igualdad económica electoral invocado establece que cualesquiera fondos que se hagan disponibles **a los partidos políticos** tienen que dividirse en partes iguales. *P.S.P. v. Secretario de Hacienda*, 110 D.P.R. 313 (1980).

En este caso, todos los fondos públicos aquí en cuestión se le conceden **a la C.E.E.** para que su presidente los utilice de acuerdo con el esquema de la Ley 403. Bajo ningún concepto se trata de la concesión de un fondo de

continúa...

[23] **...continuación**
campaña para uso particular de unos partidos en sus campañas eleccionarias, como quisieran hacernos ver los peticionarios. Valga apuntar que igual señalamiento hizo el Juez Asociado señor Hernández Denton, juez ponente en el caso de *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 625 ("[l]a Ley de Primarias Presidenciales Compulsorias no le concede fondos a ningún partido político"). Por lo tanto, no podemos darle a dicha doctrina el alcance tan excesivo que le dan los peticionarios.

De una simple lectura podemos concluir lo siguiente: primero, que se trata de un mandato directo a la Asamblea Legislativa de Puerto Rico; segundo, que todo desembolso de propiedades públicas y toda enajenación de fondos públicos se efectuará solamente mediante legislación; tercero, que dicha legislación debe cumplir con uno de dos, o ambos propósitos, a saber: (a) la legislación debe efectuarse exclusivamente para fines públicos, o (b) para el sostenimiento y funcionamiento de instituciones del Estado. Resulta pues evidente que "[e]l texto no es nada enigmático". *P.I.P. v. C.E.E.*, *supra*, pág. 606. Examinemos, por lo tanto, la jurisprudencia.

La participación de los puertorriqueños (domiciliados en Puerto Rico) en los procesos político-partidistas de los Estados Unidos no es una novedad. De ello toma conocimiento judicial este Tribunal. De hecho, esta participación ha ido aumentando paulatina y exponencialmente durante las pasadas décadas. Este hecho ya había sido evidenciado por este Tribunal previamente en *P.I.P. v. C.E.E.*, *supra*, pág. 602. Eventualmente, el Gobierno de Puerto Rico comenzó a sancionar esta ineludible participación en la política nacional estadounidense, lo cual ciertamente constituye un fin público. A raíz de esta realidad, en las últimas décadas han surgido múltiples cuestionamientos constitucionales por parte de distintos sectores (políticos) de la comunidad.

En *P.S.P. v. E.L.A.*, *supra*, este Tribunal tuvo ante si la ocasión de resolver, en síntesis, si la asignación de fondos públicos por la Asamblea Legislativa para la celebración de la **elección interna de los delegados o representantes electorales** en la Convención Nacional del Partido Demócrata de Estados Unidos cumplía con el requisito constitucional de "fin público". Resolvimos que la asignación de fondos públicos mediante ley para esos propósitos no podía ser un fin público.

En síntesis, para llegar a esa conclusión fue necesario expresarnos primero sobre cuál rama del Gobierno tenía la función y facultad de determinar qué constituye un fin público. Indicamos

que son las cortes las que tienen amplia facultad de definir lo que constituye un "fin público". Establecimos además que esta facultad era aun más de lo que permiten los "parámetros constitucionales que impone la doctrina de separación de poderes". *P.S.P. v. E.L.A.*, *supra*, págs. 598-599. Sin embargo, aunque en dicho caso nos reservamos poderes amplios para definir "fin público", no ofrecimos una definición clara y concreta. Ciertamente fuimos imprecisos, limitándonos únicamente a expresar que no constituía un fin público "la aprobación de medidas que afecten de modo importante [las] relaciones [de Puerto Rico] con Estados Unidos". *P.S.P. v. E.L.A.*, *supra*, pág. 609.

Debemos clarificar, no obstante, que este Tribunal expresó,[36] *sin resolver* (ya que *no estaba ante nos planteado*) que tampoco cumplirá con el requisito de fin público legislación relativa a "zonas reservadas al Pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo lo autorice expresamente". *P.S.P. v. E.L.A.*, *supra*, pág. 609. Allí distinguimos, sin embargo, que **"el asunto del voto presidencial" no estaba "técnicamente" planteado ante este foro en ese momento**. *P.S.P. v. E.L.A.*, *supra*, pág. 610.[37]

---

[36] Por voz del entonces Juez Presidente señor Trías Monge.

[37] La **única** controversia jurídica que exigía un pronunciamiento de este Tribunal en *P.S.P. v. E.L.A.*, *supra*, --insistimos-- era si la asignación de fondos públicos por la Asamblea Legislativa para la celebración de la **elección interna de los delegados** o representantes electorales en la Convención Nacional del Partido Demócrata de Estados Unidos cumplía con el requisito constitucional de "fin público". De hecho, ni siquiera estaba planteándose directamente la constitucionalidad de las primarias presidenciales; eso se planteó luego en *P.I.P. v. C.E.E.*, *supra*.

Por tanto, todas las expresiones del Tribunal en *P.S.P. v. E.L.A.*, *supra*, que no estuvieron directamente relacionadas con la controversia allí planteada deberán ser consideradas como *obiter dictum*; o sea, expresiones que no sientan precedente jurídico alguno por no versar sobre controversias que estuvieron propiamente planteadas ante este Tribunal en ese momento. *Martínez v. Registrador*, 54 D.P.R. 7 (1938); *Ponce & Guayama Railroad Co. v. Antonetti*, 17 D.P.R. 352 (1911).

Consecuentemente, concluimos que todos los pronunciamientos hechos por este Tribunal en *P.S.P. v. E.L.A.*, *supra*, acerca del voto presidencial, o acerca de la constitucionalidad de procesos de *referéndum*, u otros asuntos y temas, deben considerarse propiamente como *dicta*.

Posteriormente, en *P.I.P. v. C.E.E.*, *supra*, se cuestionó *por primera vez*[38] si el uso de fondos públicos para la organización y celebración de las primarias presidenciales en Puerto Rico. La cuestión principal a resolverse en *P.I.P. v. C.E.E.*, *supra*, era la siguiente: **si era constitucionalmente válida la asignación mediante ley de recursos del Gobierno de Puerto Rico para sufragar la celebración del proceso eleccionario de las primarias presidenciales de los dos partidos políticos principales de los Estados Unidos**. En otras palabras si dicha asignación de fondos cumplía con la definición de "fin público". Resolvimos que la ley impugnada era *válida* por tener un "fin público" y por cumplir cabalmente con los parámetros establecidos en *P.S.P. v. E.L.A.*, *supra*.

Además, en *P.I.P. v. C.E.E.*, *supra*, tuvimos la oportunidad de revisar algunas expresiones hechas en *P.S.P. v. E.L.A.*, *supra*, e hicimos además unos pronunciamientos que resultan ser muy importantes y pertinentes a la controversia de marras.[39] En *P.I.P. v. E.L.A.*, *supra*, hicimos la siguiente aclaración:

---

"A poco que uno reflexione sobre este intento del Tribunal de adelantarse al futuro, está uno obligado a reconocer los riesgos que enfrenta un tribunal cuando pretende reglamentar conducta en ausencia de hechos y controversias concretas". Luis M. Villaronga, *Derecho Constitucional*, 66 Rev. Jur. U.P.R. 391, 411 (1997).

[38] De entrada, es importante señalar que la primera aseveración hecha por el Juez Asociado señor Hernández Denton, autor de la opinión mayoritaria, fue imprecisa: "Nos enfrentamos **de nuevo** a un asunto **anteriormente examinado** por este Foro: la validez del uso de fondos públicos para reglamentar la celebración de **primarias presidenciales** en Puerto Rico. *P.S.P. v. Estado Libre Asociado*, [cita]". *P.I.P. v. C.E.E.*, pág. 588 (énfasis suplido). Aunque es cierto que el asunto en *P.S.P. v.*

**continúa...**

[26] **...continuación**

*E.L.A.* era similar, e inclusive relacionado, al asunto planteado posteriormente en *P.I.P. v. C.E.E.*, no es cierto que el primer caso tratara acerca de primarias presidenciales *per se*. La pregunta en *P.S.P. v. E.L.A.* fue en origen distinta: a saber, la reglamentación de **elecciones internas** de los representantes electorales del Comité Local del Partido Demócrata. Por otro lado, en *P.S.P. v. E.L.A.* nunca estuvo ante este Tribunal la constitucionalidad de la celebración de primarias presidenciales.

Sabido es que las primarias presidenciales son para escoger el **candidato a la presidencia** del Partido en cuestión, y **no meramente los representantes electorales** que acudirán a la Convención Nacional del Partido para nominar el candidato presidencial escogido en las primarias.

[39] La opinión mayoritaria del Tribunal en éste caso fue emitida por el Juez Asociado señor Hernández Dentón, a la cual se unió la Jueza Asociada señora Naviera de Rodón. El Juez Presidente señor Pons Núñez emitió voto particular de conformidad con la opinión del Tribunal. El Juez Asociado señor Ortiz emitió voto particular de conformidad con la opinión del Tribunal, a la cual se unió el Juez Presidente señor Pons Núñez. El Juez Asociado señor Alonso Alonso emitió voto particular de conformidad con la opinión del Tribunal. Los Jueces

>      [e]n *P.S.P. v. E.L.A.* . . . por primera vez reclamamos para la Rama Judicial facultades de interpretación en esta área, 'aún más amplias que las simplemente derivables de nuestro sistema de separación de poderes'. ... Hemos examinado detenidamente el legajo de la  Constituyente y concluimos que el intercambio habido entre sus miembros **no tiene el alcance que le dimos en *P.S.P. v. E.L.A.*** (Énfasis suplido).[40]

Luego este Tribunal concluyó:

>      La determinación inicial que tomen los poderes públicos –Legislativo y Ejecutivo— sobre lo que es fin público es revisable por el Poder Judicial. Sin embargo, en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y **aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos.**(Énfasis suplido).[41]

---

Asociados señores Negrón García y Rebollo López emitieron opiniones disidentes.

[40] *P.I.P. v. C.E.E.*, págs. 610–611.

[41] *Id.*, pág. 611.

Por lo tanto, es necesario concluir que la doctrina vigente bajo *P.I.P. v. C.E.E.*, *supra*, es de amplia deferencia a la Asamblea Legislativa en cuanto a su determinación de lo que es un fin público. Y hace sentido que así sea por cuanto

> [l]a naturaleza cambiante de la función legislativa justifica que es[e] cuerpo cuente con los instrumentos necesarios para encarar exitosamente los retos de la vida moderna. Por ser las Asambleas Legislativas de los Estados democráticos los cuerpos donde maduran y toman forma las fuerzas sociales latentes u operantes, y donde sólo es posible definir con la necesaria precisión la mayor parte de los elementos que componen y constituyen el llamado fin o interés público, las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución. En el Siglo XX, la función legislativa no se limita a la tarea de hacer las leyes. Su labor también consiste en el examen y la formulación de los principios rectores de la política pública para que la Rama Ejecutiva precise sus detalles.[42]

Muy bien exaltó la sabiduría de esta norma el Juez Asociado señor Ortiz, refiriéndose a ella como "norma de abstención judicial".[43] Luego éste añadió con gran acierto que

> Este evento histórico hace evidente la sabiduría de la norma, que hoy reiteramos, de abstenerse de intervenir para emitir criterios sobre la razón de ser de las decisiones en los asuntos **puramente políticos**. Esta dinámica decisional de los partidos políticos está sujeta a continuos cambios, tanto en sus propósitos como en sus pensamientos, que a su vez están sujetos a las realidades históricas y políticas del momento.(Énfasis suplido).[44]

Además, el Juez Presidente señor Pons Núñez en su voto de conformidad reiteró la postura judicial antes señalada: "Las decisiones tácticas de todos los partidos políticos han variado de tiempo en tiempo y continúan variando. Por ello esos reclamos no resultan base confiable para fundamentar nuestras determinaciones jurídicas".[45]

En *P.I.P. v. C.E.E., supra*, se intentó además precisar la definición de "fin público". Dijimos allí que en la mayoría de las ocasiones fin público es "el acomodo entre los diversos intereses particulares de las personas o grupos que componen el país".[46]

Además sostuvimos que cumplirá con la definición de fin público toda reglamentación legislativa relacionada a procesos de *expresión* electoral. *Id.*, pág. 619. Entendimos que esa definición cumplía, y cumple aún hoy, con el importante propósito de proteger a aquellos ciudadanos puertorriqueños que libremente opten por participar en actividades de esa naturaleza. *Id.*, pág. 619. Igualmente,

---

[42] *Id.*, pags. 607-08.
[43] *Id.*, pág. 670.
[44] *Id.*, pág. 673.
[45] *Id.*, págs. 678-679.
[46] *Id.*, págs. 606-607.,

dijimos que también es un fin público el acto de legislar para viabilizar la colaboración ciudadana en unos procesos que pueden "influenciar decisiones que afectan a nuestro pueblo". *Id.* Sobre este punto enfatizamos que "la Asamblea Legislativa . . . puede legislar sobre cualquier asunto que afecte el bienestar de los puertorriqueños". *Id.*, pág. 621. Y es que en el fondo de esta definición más o menos precisa yace un principio de elevada jerarquía: que la Constitución de Puerto Rico no debe ser nunca barrera para contener la *expresión* del Pueblo sino que debe ser un instrumento de su efectiva realización. *P.I.P. v. E.L.A.*, 109 D.P.R. 403, 417 (1983).

Por último, en *P.I.P. v. C.E.E.*, *supra*, reiteramos la definición de fin público esbozada en *P.S.P. v. E.L.A.*, *supra*, a los efectos de que no será fin público la aprobación de medidas que afecten de modo importante las relaciones con Estados Unidos. *P.S.P. v. E.L.A.*, *supra*, pág. 609.

De hecho, es importante apuntar que, entre otros factores, y debido a que la ley objeto de análisis en *P.I.P. v. C.E.E.*, *supra*, expresamente disponía que no se alterarían las relaciones entre Puerto Rico y Estados Unidos, se salvó su constitucionalidad. Por ejemplo, el Juez Asociado señor Alonso Alonso unió su voto de conformidad a la mayoría del Tribunal precisamente porque aquella ley expresamente dispuso que no se estaba trastocando el *status* de Puerto Rico. En el Artículo 32 de dicha ley, 16 L.P.R.A. sec. 1352, el legislador había dispuesto que

> ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en est[a Ley] podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios de su actual status.

La Asamblea Legislativa salvó de esta forma las preocupaciones constitucionales expresadas por este Tribunal en *P.S.P. v. E.L.A.*[47] Más aún, —afirmó concluyentemente el Juez Alonso Alonso—, "[e]l hecho de que los partidos políticos, sus líderes, miembros o personas, en su propaganda y expresiones públicas sostengan lo contrario no altera la letra clara de la ley". *P.I.P. v. C.E.E.*, pág. 680. Finalmente, resolvimos que "[b]ajo la óptica jurídica, . . . el proceso eleccionario que autoriza y reglamenta [la Ley], tiene un fin público, por lo que es

---

[47] *Véase P.I.P. v. C.E.E.*, *supra*, pág. 680 (voto particular, Juez Alonso Alonso).

válida la asignación de recursos del Estado para sufragar la celebración de dicho evento". *P.I.P. v. C.E.E.*, *supra*, pág. 588.

En resumen, concluimos que la doctrina vigente sobre quién determinará lo que es fin público, conforme al Art. VI, Sec. 9, es la siguiente:

Primero, si bien es cierto que le corresponde a las dos ramas –llamadas "ramas políticas"– de gobierno determinar *inicialmente* lo que es fin público, esta determinación es revisable por el Poder Judicial, en *última* instancia. *Santa Aponte v. Srio. Del Senado*, 105 D.P.R. 750 (1977); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986). Cuando este poder de revisión sea invocado, sin embargo, la doctrina de separación de poderes y abstención judicial afirmada en *P.I.P. v. C.E.E., supra*, ordena a los tribunales a actuar con prudencia y amplia deferencia a la voluntad legislativa, **"aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos"**.[48] Desde luego, debemos siempre procurar que la actuación legislativa esté enmarcado dentro del esquema constitucional vigente.[49]

Se hizo necesario llegar a esta conclusión en *P.I.P. v. C.E.E., supra*, pues "la experiencia . . . demuestra que esta polémica trata de una materia a ser discutida propiamente dentro del proceso político, en las urnas o en aquellos recintos propios de los organismos representativos del Estado. La prudencia judicial nos aconseja que sea en la arena legislativa y no en el foro judicial donde se ventile inicialmente esta controversia".[50]

Segundo, debemos concluir, además, que cumplirá con la definición de "fin público" aquella legislación que instrumente procesos de *expresión* electoral sobre asuntos que puedan influenciar a nuestro pueblo o afectar su bienestar, y que tenga, a su vez, como objetivo el acomodo entre los diversos intereses particulares de las personas o grupos que componen el país,[51] siempre que no afecte de modo importante las relaciones de Puerto Rico con Estados Unidos, que es un área reservada para "el pueblo".[52]

Por lo tanto, aplicando lo antes expresado al caso de marras, concluimos, primero, que la mayoría de este Tribunal no le está concediendo la debida deferencia a la Asamblea Legislativa –según ordenado en *P.I.P. v. C.E.E.*– amén que se trata de una controversia en donde la prudencia fuertemente aconseja que debemos

---

[48] *Id.*, *supra*, pág. 611 (énfasis añadido).

[49] De hecho, a diferencia del caso de *P.S.P. v. E.L.A.*, *surpa*, el lenguaje de la opinión en *P.I.P. v. C.E.E.*, *supra*, parece sugerir un análisis conforme al de escrutinio racional, en donde la constitucionalidad de las leyes aprobadas por la Asamblea Legislativa se presume, y donde

continúa...

[37] **...continuación**
el peso de la prueba para establecer la inconstitucionalidad del estatuto recae exclusivamente en el proponente.

[50] *Id.*, pág. 618.

[51] *P.I.P. v. C.E.E.*, *supra*.

[52] *P.S.P. v. E.L.A.*, *supra*.

abstenernos por ser una materia a ser discutida propiamente dentro del proceso político. En segundo lugar, la Ley 403 responde a un "fin público" ya que instrumenta un proceso de *expresión* electoral sobre un asunto que puede influenciar a nuestro pueblo o afectar su bienestar, y tiene, a su vez, como objetivo el acomodo entre los diversos intereses particulares de las personas o grupos que componen el país. Por último, al igual que la ley convalidada en *P.I.P. v. C.E.E.*, *supra*, la Ley 403 específicamente dispone en su artículo 4.4 que los resultados al amparo de esta ley y el número de participantes en ese proceso "[n]o podrán interpretarse como una expresión a favor ni en contra de ninguna fórmula de status político ni como tendiente a modificar en forma alguna la relación política entre Puerto Rico y los Estados Unidos de América". *Véase* Art. 4.4 de la Ley 403.

2) *La Ley 403 no viola el Artículo II, Sección 19 de la Constitución de Puerto Rico*

Nos toca considerar si la Ley 403 viola el Artículo II, sec. 19 de la Constitución de Puerto Rico, que reza:

> La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud, y el bienestar del pueblo.

La cuestión principal a resolver aquí es si la Ley 403 instrumenta un proceso que en efecto afecta o trastoca el *status* de Puerto Rico; algo que alegadamente el Art. II, sec. 19 de nuestra Constitución le ha reservado "al pueblo". Veamos.

En *P.S.P. v. E.L.A.*, *supra*, expresamos en *obiter dicta* que es "al pueblo" a quién se le ha reservado el poder de "pasar juicio sobre cualquier género de modificación sustancial en su *status* político",[53] y no a la Asamblea Legislativa. Expresamos en *dicta* además que cualquier género de modificación sustancial en el *status* de Puerto Rico reservado al pueblo debería estar sujeto "al resultado de un *referéndum* entre todos los electores de Puerto Rico".[54] Reiteramos que fueron expresiones excesivas (*dictum*) ya que no estaba propiamente planteado ante nos ese asunto.

Sin embargo, en *P.I.P. v. C.E.E.*, *supra*, —nuevamente, por voz del Juez Asociado señor Hernández Denton— tuvimos la ocasión de revisar nuestras expresiones en *P.S.P. v. C.E.E.*, *supra*. En esa ocasión resolvimos bajo una "*óptica jurídica*" que la celebración de primarias presidenciales

---

[53] P.S.P. v. E.L.A., *supra*, pág. 608.
[54] *Id.*

"no infringe el Art. II, Sec. 19 de la Carta de Derechos ... relativo a los derechos pertenecientes al pueblo . . .".[55] Aclaramos además que el problema de las expresiones de *P.S.P. v. E.L.A.*, *supra*, sobre la reserva de poder "al pueblo" de pasar juicio sobre cualquier género de modificación sustancial en su *status* político de Puerto Rico, eran esencialmente problemáticas e incorrectas ya que ignoraban el papel tan fundamental que juegan los partidos en la política local.[56] Nuestras expresiones allí fueron contundentes:

> Se entiende que la Asamblea Legislativa, distinto al Congreso, puede legislar **sobre cualquier asunto que afecte el bienestar de los puertorriqueños**. Contrario a lo que plantea el P.I.P., **el argumento sobre soberanía popular y reserva de poderes no puede esgrimirse para impugnar legislación fruto de la labor legislativa en una democracia representativa**. (Énfasis suplido).[57]

De hecho, en ese caso señalamos una inconfundible realidad, que "existe una correlación entre el sistema de partidos y el ordenamiento constitucional"[58] de Puerto Rico. Aclaramos, además, que "[e]l ciudadano raramente participa como individuo aislado y lo hace en cambio como miembro de complejas formaciones sociales [*i.e.*, partidos políticos]".[59] Consecuentemente, sería ilusorio negar dicha realidad política bajo el ambiguo argumento de que en esta área existe una reserva de poderes a favor "del Pueblo", y además, sin darle mayor consideración a una pregunta jurídica importante: ¿quiénes son los que constituyen "el pueblo"? O más bien, ¿a quién le corresponde definir "el pueblo"? Incuestionablemente, fue muy acertado el señalamiento que hiciera el Juez Asociado señor Hernández Denton:

> Los partidos políticos locales concurren a las elecciones bajo muy precisas orientaciones políticas. Estos reflejos electorales cristalizan en legislación. Pretender que estas orientaciones no respondan al sentir del sector mayoritario del electorado puertorriqueño se opone a todos los esquemas teóricos y constitucionales esbozados.

Reiteramos pues que nuestra Carta de Derechos "lejos de ser una fuente limitativa del Poder Legislativo, lo estimula. Para responder a las necesidades de Puerto Rico, la Asamblea Constituyente reconoció amplios poderes a la Rama Legislativa para formular 'los detalles inagotables' de la política pública".[60] Por lo tanto, --al igual que en *P.I.P. v. C.E.E.*, *supra*-- resolvemos que "[l]a experiencia

. . . demuestra que esta polémica trata de una materia a ser discutida propiamente dentro del proceso político, en

---

[55] *P.I.P. v. C.E.E.*, *supra*, pág. 588.
[56] *P.I.P. v. C.E.E.*, *supra*, págs. 621-624.
[57] *Id.*, pág. 621.
[58] *Id.*, pág. 616.
[59] *Id.*
[60] *Id.*, pág. 624.

las urnas o en aquellos recintos propios de los organismos representativos del Estado".[61] Consecuentemente, "[l]a prudencia judicial nos aconseja que sea en la arena legislativa y no en el foro judicial donde se ventile inicialmente esta controversia".[62]

Concluimos que no procede la contención de los peticionarios de que la Sección 19 de nuestra Carta de Derechos configura una cláusula de reserva sobre *status* que invalide la Ley 403.

Arribamos a esta conclusión además considerando que el proceso autorizado por la Ley 403 es legítimo por ser un instrumento que canaliza el más elemental derecho de los puertorriqueños dentro de nuestro sistema democrático de gobierno: el derecho a la expresión político-electoral. Veamos.

IV

*La expresión política-electoral de un pueblo es un derecho bajo la Primera Enmienda de la Constitución de los Estados Unidos y la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico*

Los peticionarios plantean que lo resuelto en el caso de *Igartua II*, *supra*, tiene el efecto de usurparle el único propósito público que tenía la Ley 403, esto es, facilitar por primera vez el voto presidencial de las personas domiciliadas en Puerto Rico. No tienen razón.

El recién resuelto caso de *Igartua II*, *supra*, no puede ser invocado como fundamento para el argumento de los peticionarios.[63] Contrario a lo que ellos sostienen, el resultado de dicho caso no puede eliminar el fin público que tiene todo proceso de expresión política-electoral, tal como el que fue aprobado por la Asamblea Legislativa mediante la Ley 403.

En todo caso, *Igartua II*, *supra*, tiene un efecto contrario al alegado por los peticionarios. Inequívocamente, dicho caso es una confirmación de que el ejercicio de expresión de aquellos puertorriqueños que voluntariamente participen en el proceso electoral en cuestión, será únicamente eso: una **expresión** de los

---

[61] *Id.*, pág. 618.

[62] *Id.*

[63] Es importante señalar que la sentencia del Primer Circuito en el caso de *Igartua II* no ha advenido final y firme. La Regla 40(a)(1) de las Reglas Federales de Procedimiento Apelativo provee a las partes en un litigio donde los Estados Unidos sea parte un término de 45 días para solicitar reconsideración o una vista ante el pleno del Tribunal ("rehearing *en banc*"). Una vez el Tribunal de Circuito federal emita una nueva decisión, o deniegue la solicitud de reconsideración bajo la Regla 40(a)(1), las partes cuentan con noventa (90) días adicionales para presentar una solicitud de *certiorari* ante el Tribunal Supremo de los Estados Unidos. 28 U.S.C. s2101(c) y la Regla 13 del Reglamento del Tribunal Supremo de Estados Unidos. Debido a que la sentencia del caso de *Igartua II* no ha advenido final y firme, y a que el Gobierno de Puerto Rico ha expresado su intención de apelar dicha decisión ante el Tribunal Supremo de los Estados creemos que no es aconsejable fundamentar la decisión que emita este Tribunal en lo que fue resuelto en *Igartua II*.

ciudadanos que así lo deseen, acerca de un asunto que ha sido muy debatido públicamente.

Debemos reconocer, además, una realidad patente: que la participación de las agrupaciones políticas puertorriqueñas en los procesos de los partidos políticos de los Estados Unidos ya ocupa una página en nuestra historia y ha sido motivo de mucha discusión pública. Por un lado, dicha participación es percibida por importantes sectores del pueblo como una fuente adicional de influencia y acceso a la estructura política nacional de los Estados Unidos. Para otros sectores constituye una estrategia electoral de los partidos políticos principales, cuyo propósito es integrar el proceso político de Puerto Rico al de Estados Unidos. Otros insinúan que es un ejercicio inútil o que no es consecuente con la separación de Puerto Rico de la nación americana.[64]

En el caso de autos, es obvio que para un sector importante "del pueblo", el evento político instrumentado por la Ley 403 será la expresión sincera de muchos puertorriqueños acerca de sus aspiraciones políticas de participar en el proceso de elegir el Presidente de los Estados Unidos. Para otros sectores importantes del pueblo —incluyendo a los peticionarios— el proceso aprobado por la Asamblea Legislativa será una oportunidad para expresarse en rechazo a las aspiraciones políticas de los primeros, ya sea dejando en blanco la papeleta, o anotando en ésta cualquier expresión que denote su rechazo. En cualquiera de los casos, no hay duda de que la Ley 403 --al igual que todos los eventos político-electorales-- es un medio para canalizar la expresión de los votantes puertorriqueños, y esto, como hemos visto, es incuestionablemente un fin público.

Por tanto, independientemente de las opiniones que se puedan difundir sobre este proceso, la Ley 403 reglamenta unos comicios de importancia política no tan sólo para un número significativo de puertorriqueños que aspiran honestamente a que Puerto Rico se incorpore a la estructura política de los Estados Unidos, sino para todos los puertorriqueños. Como tal, el proceso autorizado por la Ley 403 es un instrumento vital de expresión que ciertamente aporta al crecimiento y desarrollo de nuestra joven democracia. Esto es, la Ley 403 autoriza un ejercicio de expresión política, independientemente de si los resultados de dicho ejercicio de expresión tendrán "efectos jurídicos". Por tanto, ni la Constitución federal ni la Constitución de Puerto Rico prohiben dicho ejercicio, sino que lo protegen.

El argumento esbozado por los peticionarios de que debido al desenlace del caso de *Igartua II*, *supra*, la Ley 403 carece de finalidad pública ya que alegadamente "no produce derecho", o no tendrá "efecto jurídico" alguno, no es aceptable.

---

[64] *Véase P.I.P. v. C.E.E.*, *supra*, pág. 618.

Nunca hemos resuelto que fin público significa un fin que "produzca derecho" o que tenga efectos exclusivamente "jurídicos". Todo lo contrario, ya hemos resuelto que las primarias presidenciales celebradas hace décadas en Puerto Rico sirven un fin público, aunque estrictamente hablando, es un evento de expresión política-electoral, que ni produce derechos ni tiene efectos jurídicos. *P.I.P. v. C.E.E.*, *supra*.

De hecho, en *P.I.P. v. C.E.E.*, *supra*, resolvimos que la ley que autorizaba la utilización de fondos públicos para la celebración de las primarias presidenciales en Puerto Rico, es un ejercicio de expresión política-electoral válido dentro de nuestro esquema constitucional democrático. Esto a pesar de que en dicho proceso primarista no es un proceso de sufragio **directo**, Art. II, Sec. 2 de la Const. de P.R., ni se elige a servidor público alguno de Puerto Rico. De hecho, ni siquiera se eligen servidores para puestos públicos en Estados Unidos. Sabido es que el resultado de esas primarias no es sino una ***expresión electoral*** sobre quién prefieren los ciudadanos que sea nominado para el puesto de candidato dentro de un partido. Más importante aún, ni siquiera se elige directamente al candidato ya que la selección de la candidatura *per se* siempre es hecha mediante un voto de asamblea en la Convención Nacional, celebrada cada cuatrienio en Estados Unidos. Habiéndose reconocido la constitucionalidad de dicha ley en *P.I.P. v. C.E.E.*, *supra*, nos parece inconcebible que la Ley 403 sea declarada inconstitucional.

Así pues surge claramente que el argumento esbozado no es válido. Aceptar este argumento sería incongruente. Bajo las premisas del mismo se podría, por ejemplo, argüir que el Comisionado Residente de Puerto Rico en Washington, D.C., elegido cada cuatro años en los comicios generales de Puerto Rico, no sirve ningún fin público. Y esto bajo la proposición de que como miembro del Congreso de los Estados Unidos, sus labores allí se limitan a expresarse políticamente sobre los asuntos que competen a Puerto Rico. Sabido es que el Comisionado Residente solamente tiene derecho a expresarse en el hemiciclo de la Cámara de Representantes, sin derecho a votar en dicho foro legislativo, y por ende, no tiene facultad alguna de "producir derecho". Es decir, que bajo esa premisa la labor del Comisionado Residente no tiene "efectos jurídicos".

De manera similar, podría argüirse, por ejemplo, que los plebiscitos y *referenda* celebrados en Puerto Rico carecen de "fin público", y serían inconstitucionales, por alegadamente ser meras "encuestas". O sea, que como supuestamente carecen de todo valor, eficacia y contabilidad comicial "real", o no tienen "consecuencias jurídicas", sino sólo políticas, son inconstitucionales. Tal definición de fin público es claramente contraria a la jurisprudencia establecida por este Tribunal, y a la realidad político-constitucional dentro de nuestra democracia. A poco que uno reflexione sobre este argumento de los peticionarios se percatará que no es defendible.

Además, ya vimos que según la jurisprudencia establecida por este Tribunal, cumple con fin público aquella legislación que instrumente procesos de *expresión* electoral sobre asuntos que puedan influenciar a nuestro pueblo o afectar su bienestar, y que tenga, a su vez, como objetivo el acomodo entre los diversos intereses particulares de las personas o grupos que componen el país,[65] siempre que no afecte de modo importante las relaciones de Puerto Rico con Estados Unidos.[66]

Entendemos que el caso de *Igartua II* no priva a la Ley 403 de todo fin público. En ese sentido, acogemos enteramente los planteamientos hechos por el Procurador General en su escrito inicial sobre este asunto:

> No podemos dejar pasar por alto el hecho de que el candidato que salga electo Presidente de Estados Unidos . . . tomará innumerables decisiones importantes que afectarán de día a día [a] los puertorriqueños, en áreas tales como la seguridad pública, educación, salud y ambiente, entre otras. Más impactante aún, el Presidente es quien toma las determinaciones sobre asuntos militares que afectan la nación americana y a nuestro Pueblo; el Presidente es quién puede ordenar que nuestros hijos y seres queridos protejan la paz, libertad y principios democráticos a nivel mundial, en ocasiones sacrificando sus vidas . . . .
>
> ¿No es, [en todo caso], un fin público legítimo . . . de poder **manifestar** [entiéndase, **expresar**] al Presidente electo y su partido nacional, al igual que al candidato y partido perdedor, que el Pueblo de Puerto Rico lo respalda o no lo respalda? Como ciudadanos americanos que somos, tal mensaje nos daría más voz a nivel nacional que actualmente gozamos. Esto debido a que durante el cuatrienio que comienza (2001-2004) tanto el nuevo Presidente, al igual que su oposición política a nivel federal, conocerán por primera vez en la historia de la Nación Americana el parecer del Pueblo de Puerto Rico sobre qué candidato y qué plataforma federal se prefiere. Como resultado de ello, dicho funcionario tendría que darle a nuestro Pueblo la atención requerida y necesaria en todo asunto federal, so pena de que el Pueblo Puertorriqueño se exprese a favor o en contra del candidato presidencial en las próximas elecciones presidenciales. Aunque esto no constituye un voto *de jure* por el [P]residente, es igual de importante y efectivo, pues en un ejercicio del poder de expresión de nuestro Pueblo sobre la ejecutoria del Presidente, el cual se habrá de escuchar a través de toda la nación americana. (Énfasis suplido, notas al calce omitidas).[67]

Es importante señalar, además, que al aprobarse nuestra Constitución en el 1952, en su Preámbulo se consignó que la ciudadanía de los Estados Unidos de América

---

[65] *P.I.P. v. C.E.E.*, *supra.*
[66] *P.S.P. v. E.L.A.*, *supra.*
[67] *Véase* Informe del Procurador General, en autos, caso Núm. MD-2000-9.

es un factor determinante en nuestras vidas, y que también aspiramos a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de los derechos y prerrogativas de esa ciudadanía. *Véase*, Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico, 1 L.P.R.A. El permitir que "el pueblo" se exprese sobre su preferencia por los candidatos a Presidente y Vicepresidente de los Estados Unidos, cuente o no los votos el Congreso, es armónico con la aspiración de enriquecer nuestro acervo democrático en el disfrute de nuestra ciudadanía americana.

Este Tribunal ya ha resuelto que es válido como fin público el acto de legislar para viabilizar la colaboración ciudadana en unos procesos que pueden "influenciar decisiones que afectan a nuestro pueblo", *P.I.P. v. C.E.E.*, *supra*, pág. 609. Cabe preguntar entonces, ¿acaso la Ley 403 no cumple ampliamente con ese fin público?

Si los peticionarios quieren hacer valer sus objeciones al proceso que instrumenta la Ley 403, lo pueden hacer en la arena política, donde corresponde. De hecho, nada en la Ley 403 le prohíbe que así lo hagan. En este evento de expresión política todos los puertorriqueños se expresarán a favor de sus posturas ideológicas y políticas, como es usual en toda democracia moderna.

No importa cuáles sean las diversas posturas ideológicas y los distintos acercamientos políticos que variados sectores del Pueblo asumirán frente a este proceso de expresión política propulsada por las otras dos ramas del gobierno en esta etapa de nuestra historia. Eminentemente la importancia pública del proceso recae en que "el diálogo público y la diversidad de ideas ayudan al puertorriqueño a formar sus propios juicios sobre su participación en [el mismo]. . . . Ello fortalece la democracia puertorriqueña y adelanta los postulados constitucionales". *P.I.P. v. C.E.E.*,*supra*, pág. 681.

El Tribunal General de Justicia de Puerto Rico, ni este Tribunal, como parte de él, es el foro indicado para plantear cuestionamientos ideológicos, políticos o partidistas; la prudencia judicial siempre ha aconsejado que sea en la arena legislativa o ejecutiva, pero no en el foro judicial, donde se ventilen inicialmente estas controversias. "'No [nos] hace feliz' la preocupación excesiva del Tribunal con los partidos políticos".[68]

El argumento de los peticionarios basado en el resultado del caso de *Igartua II*, *supra*, acerca de la "no juricidad" que resultaría del proceso autorizado por la Ley 403 contradice otro argumento que también sostienen los peticionarios. Dicho

---

[68] *Véase* Villaronga, *Derecho Constitucional*, 66 Rev. Jur. U.P.R. 391, 408 , nota 63 (1997). Lamentablemente, el "activismo judicial" que denota la decisión mayoritaria tiene el desafortunado efecto de ratificar la disonancia doctrinal que muchas veces ha caracterizado a este Tribunal. *Véase además* José J. Álvarez González, *Derecho Constitucional*, 67 Rev. Jur. U.P.R. 847, 848 (1998).

argumento es que la Ley 403 tiene el efecto de trastocar las relaciones entre Puerto Rico y Estados Unidos.

Claramente, el Legislador dispuso en el artículo 4.4 de la Ley 403, que los resultados no pueden ser interpretados por el Estado para alterar o propiciar cambios en la relación jurídico-política entre Estados Unidos y Puerto Rico.

Por lo tanto, el temor de los peticionarios es cuando más, un temor infundado. Los peticionarios no han demostrado que la Ley impugnada ha *cambiado*, o *cambiará*, (*de facto* o *de jure*) el *status* político de Puerto Rico, que es lo que está reservado "al pueblo".

El artículo 4.4 de la Ley 403, anteriormente citado, es muestra del reconocimiento expreso del legislador de su carencia de intención de cambiar el *status* actual de Puerto Rico *sua sponte* mediante ese acto de Legislación.

Es pues evidente que este artículo, al igual que uno equivalente en *P.I.P. v. C.E.E.*, *supra*, salva las preocupaciones constitucionales expresadas en *P.S.P. v. E.L.A.*, *supra*. Indiscutiblemente, bajo el *status* de Puerto Rico, que fue reconocido y ratificado en *Igartua*, el Estado Libre Asociado de Puerto Rico continúa siendo –como lo era antes de la aprobación de la Ley 403— un mero territorio de los Estados Unidos sin derecho al voto presidencial bajo la Cláusula IV de la Constitución federal. *Igartua II*, *supra*, pág. 4; *Balzac v. Porto Rico*, 285 U.S. 298, 42 S.Ct. 343 (1922); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770 (1901); *DeLima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743 (1901).[69] Por tanto, los argumentos de los peticionarios no son persuasivos, ni tienen razón.

Por último, en *P.I.P. v. C.E.E.*, *supra*, establecimos como principio incólume --y, por supuesto, plenamente aplicable aquí— que "[e]l elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto rigor **bajo una multiplicidad de situaciones**".[70] A nuestro modo de ver, esta es una de esas situaciones múltiples en donde el derecho requiere que "prote[jamos] a aquellos ciudadanos que libremente opt[en] por participar en es[ta] actividad. ... [Ya que p]ermitir y hacer viable la colaboración ciudadana en unos procesos que pueden influenciar decisiones que

---

[69] *Véase además*, *Igartua II*, p. 7 ("Puerto Rico remains a colony with little prospect of exerting effective political pressure on the elected branches of government to take corrective action.") (Juez Torruella, Juez Presidente del Tribunal del Primer Circuito de E.U., opinión concurrente).
[70] *P.I.P. v. C.E.E.*, *supra*, p. 615 (énfasis suplido).

afectan a nuestro pueblo, está claramente previsto dentro de los poderes constitucionales delegados a la Rama Legislativa".[71]

Disentimos de la opinión mayoritaria que declara inconstitucional la Ley 403, *supra*. Este Tribunal, al anular la oportunidad de los electores de expresarse mediante el voto a favor de los candidatos a Presidente y Vicepresidente de los Estados Unidos obstruye el ejercicio de la libertad de expresión bajo la Primera Enmienda de la Constitución de los Estados Unidos y la Carta de Derechos de nuestra Constitución, vulnerando, además, los derechos civiles derivables de nuestra preciada ciudadanía estadounidense, un factor determinante en nuestras vidas.

                              BALTASAR CORRADA DEL RIO
                              JUEZ ASOCIADO

---

[71] *Id.*, p. 619.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eudaldo Báez Galib, por sí
como elector y como Presi-
dente del Partido Demócrata
del Estado Libre Asociado
        Peticionario

                v.

Comisión Estatal de Eleccio-
nes y Estado Libre Asociado
        Requeridos
_____

Damaris B. Mangual Vélez;
y otros
        Peticionarios

                v.

Comisión Estatal de Eleccio-
nes; y otros
        Recurridos

| | |
|---|---|
| MD-2000-8 | Mandamus |
| MD-2000-9 | (Jurisdicción original) |

Opinión disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 2 de noviembre de 2000.

Los peticionarios presentaron ante este Tribunal una solicitud de mandamus contra la Comisión Estatal de Elecciones, los Comisionados del Partido Nuevo Progresista y del Partido Popular Democrático, y el Estado Libre Asociado. En síntesis, plantean la inconstitucionalidad de la Ley Núm. 403 de 10 de septiembre de 2000, mejor conocida como la "Ley de Elecciones Presidenciales en Puerto Rico".

I

La Ley Núm. 403, supra, con vigencia inmediata, dispone que la Comisión Estatal de Elecciones tendrá responsabilidad para organizar                                              e

implantar un proceso para la elección presidencial en la jurisdicción del Estado Libre Asociado de Puerto Rico, que habrá de celebrarse conjuntamente con la elección general.[72]   Para tales fines, autorizó el uso de recursos públicos, empleados y funcionarios adscritos a la Comisión para llevar a cabo la referida elección.[73]   Sobre este particular, el Artículo 4.3 de la Ley Núm. 403, supra, asigna la cantidad de novecientos mil dólares ($900,000) para la implantación del proceso sobre el voto presidencial.

Los peticionarios argumentan, entre otros planteamientos, que la Ley Núm. 403, supra, constituye un ejercicio inconstitucional de la autoridad legislativa, en violación del Artículo II, Sección 19, de la Constitución de Puerto Rico, pues pretende implantar ficticiamente un derecho legal inexistente.   Arguyen, que la referida ley tiene como fin alterar la relación de poder entre Puerto Rico y los Estados Unidos, sin que medie autorización del pueblo.[74]   Alegan que la autoridad legal para modificar esa relación de poder entre Puerto Rico y los Estados Unidos, es del pueblo puertorriqueño.

La petición de mandamus presentada se fundamenta en que los aquí demandados tienen el deber ministerial de implantar e instrumentar un ordenamiento electoral que garantice la pureza electoral; que asegure que cada voto emitido en efecto se cuente como fue emitido; y que proteja el derecho constitucional al voto. Plantea, que esos deberes ministeriales emanan de la Constitución de Puerto Rico y de la Ley Electoral vigente en la Isla.   Por otro lado, arguyen que la Ley Núm. 403, supra, constituye un ejercicio inconstitucional de autoridad legislativa, en contravención con el Artículo II, Sección 19, de la Constitución de Puerto Rico, pues pretende implantar un derecho legal inexistente y altera la relación de poder entre Puerto Rico y los Estados Unidos, sin la autorización del Pueblo.   Aducen que el Pueblo de Puerto Rico ostenta el poder para resolver cualquier cuestión relacionada con su futuro político, por tanto la Legislatura carece de poder para legislar en áreas que el pueblo se ha reservado para sí, como lo es el voto presidencial.   Apoyan su argumento en los pronunciamientos de este Tribunal en P.S.P. v. E.L.A., 107 D.P.R. 590 (1978).


II

Concluimos que la presente petición de mandamus no es procedente. Entendemos, que el presente recurso pretende que declaremos como inconstitucional la Ley Núm. 403, supra.   Ello no es posible a través del recurso extraordinario

---

[72] Artículo 1.3 de la Ley Núm. 403, supra.

[73] Íd.

y privilegiado de <u>mandamus</u>.  Nuestro ordenamiento jurídico dispone el mecanismo de sentencia declaratoria ante el Tribunal de Primera Instancia para realizar ese tipo de petición.[75]  Veamos.

El <u>mandamus</u> es un recurso extraordinario de equidad, "altamente privilegiado", que emite el Poder Judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir un acto que la ley expresamente ordena como un deber resultante de un empleo, cargo o función pública.[76]  <u>Noriega Rodríguez v. Hernández Colón</u>, 135 D.P.R. 406 (1994).

El requisito primordial del recurso es que se trate de un deber ministerial impuesto por ley.  La jurisprudencia ha establecido que la determinación de la procedencia del auto depende de si la actuación solicitada es un deber ministerial o si, por el contrario, envuelve el ejercicio de discreción, en cuyo caso no puede expedirse.[77]  No obstante, la distinción entre lo que constituye un deber ministerial o una actuación discrecional, de ordinario, no es muy clara ni sencilla.[78]

Precisa señalar, que es improcedente el vehículo procesal de <u>mandamus</u>, cuando existe otro mecanismo para atender el remedio solicitado.  Es improcedente cuando la petición de <u>mandamus</u> requiere la atención y consideración de un planteamiento sobre la inconstitucionalidad de una ley.  En <u>Márquez v. Gierbolini</u>, 100 D.P.R. 839, 840 (1972), este Foro, mediante resolución, expresó lo siguiente: "Atendido el hecho de que sólo procede el <u>mandamus</u> para hacer cumplir un deber ministerial claramente dispuesto por ley, y habida cuenta que en el presente caso primeramente hay que determinar

---

[74] Petición de *Mandamus*, MD-2000-9, págs. 5-6.
[75] Regla 59 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59.

[76] Artículos 649 y 650 del Código de Enjuiciamiento Civil de 1933, 32 L.P.R.A. secs. 3421 y 3422.

[77] <u>Álvarez de Choudens v. Tribunal Superior</u>, 103 D.P.R. 235 (1975); <u>Partido Popular v. Junta de Elecciones</u>, 62 D.P.R. 745 (1944).

[78] Voto Particular de Conformidad del Juez Asociado señor Hernández Denton, en <u>Asoc. Res. de Piñones v. J.C.A.</u>, 142 D.P.R. ___ (1997), 97 J.T.S. 27, res. el 4 de marzo de 1997, citando a David Rivé Rivera,

la constitucionalidad de un estatuto de la Asamblea Legislativa de Puerto Rico, no ha lugar al auto solicitado.  Considerada la petición de mandamus como una demanda de sentencia declaratoria, se da traslado de la misma al Tribunal Superior, Sala de San Juan, por no tener este Tribunal jurisdicción para conocer de ella en primera instancia".  En Gierbolini v. Hernández Colón, 129 D.P.R. 402 (1991), un grupo de electores solicitó, en jurisdicción original, la expedición del auto de injunction y de mandamus en el Tribunal Supremo para que se le ordenara a la Comisión Estatal de Elecciones que, en cumplimiento de la Ley Electoral, no celebrara el referéndum de "Derechos Democráticos" pautado para el 8 de diciembre de 1991.  El Tribunal Supremo desestimó la petición por falta de jurisdicción y, además, porque el recurso de mandamus no reunía los requisitos de ese remedio extraordinario y privilegiado.[79]  El remedio que se perseguía era que se declarara la inconstitucionalidad de la ley del referéndum de "Derechos Democráticos", o que se declarara como "ultra vires" los actos de los funcionarios de la Comisión; algo que sólo se podía obtener mediante el remedio de sentencia declaratoria ante el entonces Tribunal Superior, sobre el cual el Tribunal Supremo carece de jurisdicción original.[80]

Posteriormente, en El Vocero v. C.E.E.,[81] este Tribunal expresó que "[p]or ser nuestra jurisdicción original una limitada que no incluye el poder de entender en recursos de sentencia declaratoria e injunction como el presente, denegamos el recurso titulado mandamus

---

Recursos Extraordinarios, 2da ed., San Juan, Programa de Educación Jurídica Continua, 1996, pág. 110.

[79] La Resolución de este Tribunal citó un fragmento del voto separado que emitió el Juez Asociado señor Dávila.  Éste lee como sigue:

> [l]a importancia que pueda tener una cuestión para un litigante no concede jurisdicción a un tribunal para conocer de un pleito si la ley no la establece.  Respetar la ley, tanto la que gobierna la conducta de los individuos como la que gobierna la función de un tribunal, es fundamental para la permanencia de un gobierno de ley.  Márquez v. Gierbolini, 100 D.P.R. 839, 841 (1972).  (Énfasis nuestro.)

[80] David Rivé Rivera, op. cit., pág. 108.

[81] 130 D.P.R. 525 (1992).

presentado por El Vocero de Puerto Rico, sin perjuicio de que pueda presentarlo en el foro de instancia.  Art. V, Sec. 5 Const. E.L.A., L.P.R.A., Tomo 1."[82]

En el día de hoy se nos presenta idéntica contención, pues se pretende, mediante la petición de mandamus, que se declare la inconstitucionalidad de la Ley Núm. 403, supra.  En vista de esta clara pretensión, nos corresponde reafirmar que **no se puede utilizar ante este Tribunal el recurso de mandamus para que pasemos juicio sobre la inconstitucionalidad de una ley o un acto administrativo. Tampoco debe utilizarse para obligar a cumplir un acto, o una ley que se alega es inconstitucional.**[83]  **Sobre este particular, el Artículo 3 de la Ley de Mandamus**[84] **dispone que el recurso de mandamus sólo debe expedirse cuando el peticionario carece de "un recurso adecuado y eficaz en el curso ordinario de la ley"**.[85]


III

En P.S.P. v. E.L.A., supra, el Partido Socialista Puertorriqueño en el año 1978 presentó ante el Tribunal de Primera Instancia una demanda de sentencia declaratoria e interdicto contra el Estado Libre Asociado y la Comisión Estatal de Elecciones, entre otros.  El demandante adujo que la Ley Núm. 102 de 24 de junio de 1977, conocida como la "Ley de Primarias Presidenciales Compulsorias", autorizó indebidamente el uso de fondos públicos para organizar y realizar un proceso interno de primarias del Partido Demócrata de los Estados Unidos en Puerto Rico.  Arguyó que el fin de ese proceso era la constitución de un comité del referido partido nacional. Entre otros pronunciamientos, este Tribunal se expresó, **a pesar de no habérsele**

---

[82] Íd.

[83] David Rivé Rivera, op. cit., págs. 108-109.

[84] 32 L.P.R.A. sec. 3423.

**planteado,** que la Asamblea Legislativa está desprovista de poder para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo la autorice expresamente. Determinó, que la asignación de fondos para esos fines infringe la Sección 9 del Artículo VI y la Sección 19 del Artículo II de la Constitución del Estado Libre Asociado.[86] No obstante, este Tribunal reconoció, en ese caso, **que el asunto del voto presidencial no se encontraba ante su consideración.** A esos efectos expresó lo siguiente.

> En consideración a que podría argumentarse, con razón o sin ella, que la asignación en este caso se limita a financiar una actividad interna de una agrupación afiliada a un partido de Estados Unidos, **sin que técnicamente se encuentre ante este foro el asunto del voto presidencial.**[87]

En vista de lo anterior, el pronunciamiento antes aludido constituye una expresión exógena a la controversia planteada. Dicho enunciado, es, pues, *obiter dictum*, el cual no debe considerarse o interpretarse como constitutivo de norma jurisprudencial, ni mucho menos de un deber ministerial.

IV

Consideramos el asunto que plantea este caso, como uno que no debe ser objeto de determinación judicial. Veamos.

La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas, que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[88] Los tribunales nos imponemos las limitaciones que emanan de esa doctrina para, entre otras cosas, observar y garantizar el justo

---

[85] Véase, <u>Álvarez de Choudens v. Tribunal Superior</u>, 103 D.P.R. 235 (1975). David Rivé Rivera, <u>op. cit.,</u> pág.114.

[86] <u>P.S.P. v. E.L.A.,</u> <u>supra</u>.

[87] Íd., a la pág. 610.

balance que se requiere de las distintas ramas de gobierno en la administración de la cosa pública.  El análisis de este principio es, por lo tanto, uno imperativo y necesario dentro de nuestro sistema de separación de poderes.  Las limitaciones que surgen del mismo imponen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática de nuestro sistema.[89]

La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determina la jurisdicción de los tribunales, particularmente con relación a las controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta.  Se trata, pues, de una cuestión de umbral que debemos analizar ante las controversias que nos ocupa.[90]

La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge de consideraciones sobre el principio constitucional de separación de poderes.[91]  Si en un caso hay presente una cuestión política, el caso no será justiciable, y el tribunal debe abstenerse de adjudicarlo.  La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación judicial, porque su resolución corresponde a las otras ramas del gobierno, la legislativa o ejecutiva, o en última instancia al electorado.[92]

Una cuestión política no es susceptible de determinación judicial, porque su resolución corresponde propiamente al proceso político de gobierno, que se produce en las otras dos ramas, y no al poder judicial.[93]

Los criterios judiciales para determinar qué constituye una cuestión política son:

**(A) La Constitución delega expresamente el asunto en controversia a otra rama del gobierno;**

(B) No existen criterios o normas judiciales apropiadas para resolver la controversia;

---

[88] E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

[89] Íd., a la pág. 597.

[90] P.P.D. v. Peña Clos, 140 D.P.R. ___ (1996), 96 J.T.S. 78, res. el 17 de mayo de 1996.

[91] Baker v. Carr, 369 U.S. 186, 210 (1962).

[92] Noriega v. Hernández Colón, 135 D.P.R. 406, 422 (1994).

[93] Silva v. Hernández Agosto, 118 D.P.R. 45 (1986); Santa Aponte v. Srio. del Senado; 105 D.P.R. 750 (1977); Powell v. McCormick, 395 U.S. 486 (1969).

**(C) Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales;**

**(D) Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno;**

(E) Hay una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente;

(F) Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del gobierno sobre un punto.[94]

> **The political question doctrine-which holds that certain matters are really political in nature and best resolved by the body politic rather than by courts exercising judicial review- is a misnomer.  It should more properly be called the doctrine of nonjusticiability, that is, a holding that the subject matter is inappropriate for judicial consideration...  An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review.** Unlike other restrictions on judicial review-doctrines such as case or controversy requirements, standing, ripeness and prematurely, abstractness, mootness, and abstention- all of which may be cured by different factual circumstances, a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny.[95]  (Énfasis nuestro.)

Hemos expresado, aludiendo al profesor Raúl Serrano Geyls, que existen tres (3) vertientes de la doctrina de cuestión política, a saber: (1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto, porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (b) aquella según la cual los tribunales deben abstenerse de intervenir, bien porque no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos; y (c) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia.[96]

Si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, la misma no estará sujeta a revisión judicial, salvo que se ejecute incorrectamente, afectando derechos constitucionales de igual jerarquía.[97]

---

[94] Baker v. Carr, supra, reafirmado en nuestra jurisdicción en Silva v. Hernández Agosto, 118 D.P.R. 45 (1986).

[95] Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law, Substance and Procedure, Third Ed., St.

Paul, West Group, 1999, Vol. I., sec. 2.16(a), págs. 311-312.

[96] C.E.S., U.P.R. v. Gobernador, 137 D.P.R. 83, 102 (1994); Noriega v. Hernández Colón, 135 D.P.R. 406, 422 (1994).

[97] Powell v. McCormick, supra; U.S. v. Nixon, 418 U.S. 683 (1974); Silva v. Hernández Agosto, 118 D.P.R. 45 (1986); R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Colegio de Abogados de Puerto Rico, 1986, Vol. I, págs. 697-698.

Lo realmente importante en los casos que envuelven la doctrina de cuestión política, es el análisis sobre si una cláusula constitucional provee derechos que pueden ser compelidos mediante acción judicial.[98]

La doctrina de cuestión política debe ser aplicada en términos funcionales, a tenor con los hechos específicos de cada caso en particular. La doctrina no es aplicable cuando existen derechos individuales importantes que podrían ser afectados si el Poder Judicial no actúa.[99]

Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del gobierno o al electorado.[100] En Silva v. Hernández Agosto, supra, reiteramos nuestros pronunciamientos anteriores y expresamos que "ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución, y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional". La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales.[101]

La controversia ante nos no es justiciable. La actuación del Poder Legislativo, al aprobar la Ley Núm. 403, supra, está dentro de los poderes delegados por los constituyentes, a esa rama de gobierno. No encontramos en tal esfuerzo del Poder Legislativo un ejercicio incorrecto de su autoridad o derechos constitucionales de igual jerarquía afectados, que amerite nuestra intervención. Por el contrario, garantiza y viabiliza la expresión ciudadana sobre un asunto de alto interés público. Sobre este tema hemos expresado, que el permitir y hacer viable la colaboración y la participación ciudadana en unos procesos que pueden influenciar decisiones que afectan a nuestro pueblo, está claramente previsto dentro de los poderes constitucionales delegados a la Rama Legislativa.[102] Más que eso, concluimos que tal asunto constituye un deber u obligación de esa rama de gobierno con la ciudadanía.

El Artículo II, Sección 19, de la Constitución de Puerto Rico no configura una cláusula de reserva sobre status, que impida que

---

[98] L.A. Tribe, American Constitutional Law, Mineola, 2da ed., New York, The Foundation Press, Inc., 1988, pág. 98 y pág. 106.

[99] Scharpf, Judicial Review and The Political Question: A Functional Analysis, 75 Yale L.J., 566-597 (1966); Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).

[100] Noriega Rodríguez v. Jarabo, supra.

[101] United States v. Nixon, 418 U.S. 683 (1974).

[102] P.I.P. v. C.E.E, 120 D.P.R. 580, 619 (1988).

la Asamblea Legislativa de Puerto Rico pueda aprobar la Ley Núm. 403, supra, para viabilizar una expresión del Pueblo de Puerto Rico bajo la Primera Enmienda de la Constitución de los Estados Unidos, para decidir el solicitar lo que pueda considerar la ciudadanía como la reparación de un agravio al Congreso. Dicha cláusula, lejos de ser una fuente limitativa del Poder Legislativo, lo estimula, particularmente en la búsqueda de mecanismos de expresión de la ciudadanía sobre asuntos de alto interés público que pueden influenciar decisiones que los afectan.[103]

El Preámbulo de la Constitución de Puerto Rico, más allá de ser una simple proclamación de principios, tiene pleno valor de derecho constitucional positivo, que se traduce en la adhesión del Pueblo a unos principios y compromisos que quedaron plasmados en el magno documento a través de los constituyentes, legitimados por su elección.[104]

El Preámbulo de nuestra Constitución establece que, mediante ese magno documento, el Pueblo de Puerto Rico organizó un sistema de gobierno interno para sí mismo sobre una base plenamente democrática, para promover el bienestar general y asegurar el goce cabal por sus ciudadanos de los derechos humanos. Consideró como fundamental para la vida de su comunidad el sistema democrático. Conceptualizó el mismo como aquél donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas. Proclamó la aspiración de su comunidad a continuamente enriquecer su acervo democrático en el disfrute individual y colectivo de los derechos y prerrogativas de la ciudadanía de los Estados Unidos.[105]

---

[103] Íd., a las págs. 621-624.

[104] Íd., a la pág. 619.

[105] Preámbulo de la Constitución de Puerto Rico.

Concluimos que a través de la Ley Núm. 403, _supra_, el Poder Legislativo llevó a cabo un proceso de gobierno, dentro de sus facultades constitucionales, a través del cual le está permitiendo y viabilizando a la ciudadanía el ejercicio de una expresión dirigida al Congreso de los Estados Unidos. Tal asunto corresponde propiamente al proceso político de gobierno, que se produce en las otras dos ramas, y no al poder judicial. Al intervenir este Tribunal con tal proceso, está transgrediendo la forma republicana de gobierno y suplantando o anulando la política pública formulada en la Ley Núm. 403, _supra_, para hacer efectivo lo preceptuado en el Preámbulo de la Constitución de Puerto Rico, que constituye una aspiración del pueblo a continuamente enriquecer su acervo democrático en el disfrute individual y colectivo de los derechos y prerrogativas de la ciudadanía de los Estados Unidos.

V

Entendemos que este Tribunal al actuar de conformidad con su decisión, lo está haciendo en forma inconsistente con lo actuado en casos anteriores de similar naturaleza, en los cuales entendió que no tenía jurisdicción original. En vista de que la mayoría ha decidido asumir jurisdicción original en este asunto, y habiendo expresado previamente mi opinión al respecto sobre la ausencia de tal jurisdicción de este Tribunal y de la falta de justiciabilidad de la controversia, no tenemos otra alternativa, en el descargo de nuestro ministerio, de discutir los méritos de lo planteado sobre la alegada inconstitucionalidad del estatuto, por la importancia pública del asunto.

En su aspecto ideológico, este tema del voto presidencial es uno que provoca intensas y conflictivas emociones y expresiones de tipo político partidista. No obstante, bajo la óptica jurídica, entendemos que el proceso autorizado por la Ley Núm. 403, _supra_, tiene un fin público, por lo que es válida la asignación de recursos del Estado para sufragar la celebración de dicho evento. Concluimos que

la referida ley no infringe el Artículo IV, Sección 9, y el Artículo II, Sección 19, de la Constitución de Puerto Rico.  Veamos.

El 16 de diciembre de 1966 se adoptó el Pacto Internacional de Derechos Civiles y Políticos por la Asamblea General de la Organización de Naciones Unidas.[106]  Dicho "Pacto" fue aprobado por los Estados Unidos el 2 de marzo de 1992.  Su ratificación fue depositada en la Secretaría de la Asamblea General de la Organización de Naciones Unidas el 8 de junio de 1992.  Entró en vigor para los Estados Unidos el 8 de septiembre de 1992.[107]

Dicho "Pacto" dispone, en su Artículo 25, lo siguiente:

Todos los ciudadanos gozarán, sin ninguna de las distinciones mencionadas en el artículo 2, y sin restricciones indebidas, de los siguientes derechos y oportunidades:

(a) participar en la dirección de los asuntos públicos, directamente o por medio de representantes libremente elegidos;

(b) votar y ser elegido en elecciones periódicas, auténticas, realizadas por sufragio universal e igual y por voto secreto que garantice la libre expresión de la voluntad de los electores;

(c) tener acceso, en condiciones generales de igualdad, a las funciones públicas de su país.

En su Artículo 2 dispone lo siguiente:

1. Cada uno de los Estados Partes en el presente Pacto se compromete a respetar y a garantizar a todos los individuos que se encuentren en su territorio y estén sujetos a su jurisdicción, los derechos reconocidos en el presente Pacto, sin distinción alguna de raza, color, sexo, idioma, religión, opinión pública o de otra índole, origen nacional o social, posición económica, nacimiento o cualquier otra condición social.

**2. Cada Estado Parte se compromete a adoptar, con arreglo a sus procedimientos constitucionales y a las disposiciones del presente Pacto, las medidas oportunas para dictar las disposiciones legislativas o de otro carácter que fueren necesarias para hacer efectivos los derechos reconocidos en el presente Pacto y que no estuviesen ya garantizados por disposiciones legislativas o de otro carácter.**

3. Cada uno d

---

[106] Nila Torres Ugena, <u>Textos Normativos de Derecho Internacional Público</u>, 4ta ed., Madrid, Ed. Civitas, 1994, págs. 451-464.

[107]  Véase, <u>A Guide to the United States Treaties In Force</u> (edited by Igor I. Kavass), 1999 Ed., New York, William S. Hein & Co., Book III, págs. 28 y 494; <u>United States Treaty Index</u> (Compiled and Edited by Igor I. Kavass), 1995 Revision, New York, William S. Hein & Co., 1997, Vol. 5, pág. 347.

**a) toda persona cuyos derechos o libertades reconocidos en el presente Pacto hayan sido violados podrá interponer un recurso efectivo, aun cuando tal violación hubiera sido cometida por personas que actuaban en ejercicio de sus funciones oficiales;**

**b) la autoridad competente judicial, administrativa o legislativa, o cualquiera otra autoridad competente prevista por el sistema legal del Estado, decidirá sobre los derechos de toda persona que interponga tal recurso, y a desarrollar las posibilidades de recurso judicial;**

**c) las autoridades competentes cumplirán toda decisión en que se haya estimado procedente el recurso.**
(Énfasis nuestro.)

Los Estados Unidos, al suscribir y ratificar el referido "Pacto", hizo las

siguientes expresiones como reservas, entendidos y declaraciones:

Reservations:

(1) That article 20 does not authorize or require legislation or other action by the United States that would restrict the right of free speech and association protected by the Constitution and laws of the United States.

(2) That the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other that a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

(3) That the United States considers itself bound by article 7 to the extent that `cruel, inhuman or degrading treatment or punishment´ means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and-or- Fourteenth Amendments to the Constitution of the United States.

(4) That because U.S. law generally applies to an offender the penalty in force at the time the offence was committed, the United States does not adhere to the third clause of paragraph 1 of article 15.

(5) That the policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of article 10 and paragraph 4 of article 14. The United States further reserves to these provisions with respect to States with respect to individuals who volunteer for military service prior to age 18.

Understandings:

(1) That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status -as those terms are used in article 2, paragraph 1 and article 26- to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in paragraph 1 of article 4 upon discrimination, in time of public emergency, based 'solely' on the status of race, colour, sex, language, religion or social origin, not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

(2) That the United States understands the right to compensation referred to in articles 9(5) and 14(6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

(3) That the United States understands the reference to 'exceptional circumstances' in paragraph 2(a) of article 10 to permit the imprisonment of an accused person with convicted persons where appropriate in light of an individual's overall dangerousness, and to permit accused persons to waive their right to segregation from convicted persons.  The United States further understands that paragraph 3 of article 10 does not diminish the goals of punishment, deterrence, and incapacitation as additional legitimate purposes for a penitentiary system.

(4) That the United States understands that subparagraphs 3(b) and (d) of article 14 do not require the provision of a criminal defendant's counsel of choice when the defendant is provided with court-appointed counsel on grounds of indigence, when the defendant is financially able to retain alternative counsel, or when imprisonment is not imposed. The United States further understands that paragraph 3(e) does not prohibit a requirement that the defendant make a showing that any witness whose attendance he seeks to compel is necessary for his defense. The United States understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgement of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit, as is seeking a new trial for the same cause.

**(5) That the United States understands that this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriate measures for the fulfillment of the Covenant.** (Énfasis nuestro.)

Declarations:

**(1) That the United States declares that the provisions of articles 1 through 27 of the Covenant are not self-executing.** (Énfasis nuestro.)

(2) That is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions of limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant.  For the United States, article 5, paragraph 3, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to article 19, paragraph 2, which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.
(3) That the United States declares that the right referred to in article 47 may be exercised only in accordance with international law.

Sobre la competencia del Comité de Derechos Humanos creado por el Artículo 28 del "Pacto",[108] Estados Unidos expresó los siguiente:

---

[108] Dicho Artículo lee de la siguiente manera:

1. Se establecerá un Comité de Derechos Humanos (en adelante denominado el Comité).  Se compondrá de 18

> The United States declares that it accepts the competence of the Human Rights Committee to receive and consider communications under article 41 in which a State Party claims that another State Party is not fufilling its obligations under the Covenant.

Como hemos podido observar, el referido "Pacto" define la naturaleza del agravio para el cual la Ley Núm. 403, supra, dispone un mecanismo de expresión del pueblo para que pueda solicitarle al Congreso su reparación, en vista de que los Estados Unidos lo aceptó como uno no autoejecutable.

El derecho de los ciudadanos de los Estados Unidos, domiciliados en Puerto Rico, a participar, en forma directa o por medio de representantes libremente elegidos, en la dirección de los asuntos públicos y a tener acceso en condiciones generales de igualdad a las funciones públicas del gobierno que tiene jurisdicción sobre él, es uno reconocido por los Estados Unidos al firmar ese "Pacto" y subscribir los compromisos allí contenidos. Constituye el derecho fundamental del ser humano de participar y tener acceso a los procesos de constitución del gobierno que tiene autoridad sobre él. El que esos ciudadanos no disfruten de ese derecho fundamental, respecto a la configuración del Congreso y la selección del Presidente de los Estados Unidos, es un agravio que está definido por ese "Pacto". La Ley Núm. 403, supra, lo que provee es un mecanismo para viabilizar una expresión del Pueblo de Puerto Rico sobre una parte de tal asunto, a tenor con lo dispuesto por el Preámbulo de la Constitución de Puerto Rico.

La Ley Núm. 403, supra, no persigue con su aprobación el producir un cambio en la relación actual de Puerto Rico y los Estados Unidos. Su letra escrita es clara en cuanto a la intención que tuvo la Asamblea

---

miembros, y desempeñará las funciones que señalan más adelante.

2. El Comité estará compuesto de nacionales de los Estados Partes en el presente Pacto, que deberán ser personas de gran integridad moral, con reconocida competencia en materia de derechos humanos. Se tomará en consideración la utilidad de la participación de algunas personas que tengan experiencia jurídica.

3. Los miembros del Comité serán elegidos y ejercerán sus funciones a título personal.

Legislativa de Puerto Rico al promulgarla. No existiendo, hasta el momento, el derecho de los puertorriqueños a participar en la selección del Presidente de los Estados Unidos a la luz de la decisión del Tribunal de Apelaciones de Estados Unidos, Primer Circuito, ubicado en Boston, Massachusetts, dicha ley tiene un propósito y fin completamente legítimo de viabilizar tal expresión.[109]

Independientemente que los votos emitidos por los ciudadanos de los Estados Unidos domiciliados en Puerto Rico sean o no contabilizados por el Congreso de los Estados Unidos, asunto eminentemente del ámbito federal, dichos ciudadanos ciertamente tienen en la Ley Núm. 403, supra, un mecanismo para que, bajo la Primera Enmienda de la Constitución de los Estados Unidos, expresen su deseo de participar o no en el proceso de selección del Presidente y dicho resultado sea comunicado al Congreso como una solicitud de reparación de un agravio. La persona seleccionada como Presidente de los Estados Unidos tomará innumerables decisiones que afectarán a los puertorriqueños domiciliados en la Isla en su vida diaria, en áreas tales como la seguridad, educación, salud, y ambiente, entre otras no menos importantes. El Presidente de los Estados Unidos toma las decisiones sobre aspectos militares que afectan también a los puertorriqueños en asuntos de vida o muerte.

¿No es acaso un fin público legítimo permitirle a los ciudadanos de los Estados Unidos domiciliados en Puerto Rico expresarse o no sobre si habrán de solicitar al Congreso, bajo la Primera Enmienda de su Constitución, la reparación de lo que puedan considerar como un agravio, consistente en mantenerlos en una situación que, por el momento, no les permite participar en el proceso de selección de la persona que habrá de tener la autoridad y la responsabilidad como

---

[109] Por no constituir la decisión de dicho Tribunal una final y firme, y porque podría estar tal asunto, a tenor con el Artículo 2(3)(b) del "Pacto", bajo la consideración del Tribunal Supremo de los Estados Unidos, de presentar alguna de las partes afectadas el recurso en alzada a que tienen derecho, entiendo que la intervención de este Tribunal es una a destiempo y exhibe una falta de deferencia al foro judicial federal.

Presidente de los Estados Unidos sobre ellos?   Creemos que afirmativamente sí tiene tal carácter.

El mecanismo establecido por la Ley Núm. 403, supra, le permite a los ciudadanos de los Estados Unidos a decidir no participar en el proceso, por entender que tal situación no es un agravio.  Les permite expresarse a aquellos que sí piensan constituye un agravio y quieren enviar al Congreso de los Estados Unidos un mensaje que ellos creen conveniente y necesario.

La Ley Núm. 403, supra, permite que el Pueblo de Puerto Rico, a través del mecanismo que provee, pueda, en uso de su libertad de expresión, que constituye un derecho y prerrogativa que disfrutan los ciudadanos de los Estados Unidos domiciliados en Puerto Rico bajo la Primera Enmienda de la Constitución Federal, enriquecer su acervo democrático, que es un derecho que tienen bajo la Constitución de Puerto Rico, viabilizando una comunicación al Congreso para solicitarle la reparación de lo que puedan o no considerar como un agravio.  Tal comunicación le permitiría a la ciudadanía influenciar la toma de decisiones en áreas que son fundamentales y afectan su vida diaria y cotidiana.


VI

Por los fundamentos antes indicados, muy respetuosamente, disiento de la opinión mayoritaria.


Efraín E. Rivera Pérez
Juez Asociado